**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-2086**

FLEUR S. BRESLER, as the Co-Personal Representative of the Estate of Charles S. Bresler; SIDNEY BRESLER, Individually, as a Beneficiary of the Charles S. Bresler Irrevocable Insurance Trust; SIDNEY M. BRESLER, as the Co-Personal Representative of the Estate of Charles S. Bresler,

Plaintiffs – Appellees,

v.

WILMINGTON TRUST COMPANY,

Defendant – Appellant,

and

WILMINGTON BROKERAGE SERVICES COMPANY, a/k/a Wilmington Trust Brokerage; HIGHLAND CAPITAL BROKERAGE, INC., a/k/a Highland Capital Brokerage; EDMOND IANNI; RALPH WILECZEK; MATTHEW WASCHULL; RICHARD BIBOROSCH,

Defendants.

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Peter J. Messitte, Senior District Judge. (8:09-cv-02957-PJM)

Argued: December 8, 2016                    Decided: April 20, 2017

Before KEENAN, WYNN, and HARRIS, Circuit Judges.

Affirmed by published opinion.  Judge Keenan wrote the opinion, in which Judge Harris joined.  Judge Wynn wrote a separate opinion concurring in part and dissenting in part.

_____

**ARGUED:** James Lindsay Shea, VENABLE LLP, Baltimore, Maryland, for Appellant. Philip M. Musolino, MUSOLINO & DESSEL PLLC, Washington, D.C., for Appellees. **ON BRIEF:** Mitchell Y. Mirviss, Christopher S. Gunderson, VENABLE LLP, Baltimore, Maryland; David T. Case, Stavroula E. Lambrakopoulos, R. James Mitchell, K&L GATES LLP, Washington, D.C., for Appellant.  Mark T. Stancil, Alan D. Strasser, ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP, Washington, D.C., for Appellees.

_____

BARBARA MILANO KEENAN, Circuit Judge:

In this appeal, we consider breach of contract claims brought by Fleur Bresler (Fleur) and her son, Sidney Bresler (Sidney) (collectively, the plaintiffs), as Co-Personal Representatives of the Estate of Charles S. Bresler (the Estate). A jury determined that defendants Wilmington Trust Company and Wilmington Brokerage Services Company (collectively, Wilmington) breached an agreement to lend money for the acquisition, maintenance, and certain investments relating to life insurance policies obtained for Charles S. Bresler (Charlie)[1] and his wife, Fleur. The jury awarded the plaintiffs around $23 million in damages. The district court determined post-trial that Wilmington also had breached an agreement to return certain funds to the Estate upon Charlie's death, and ordered Wilmington to return those funds in accordance with the parties' agreement.

Wilmington appeals, arguing that: (1) the district court erred in admitting testimony from the plaintiffs' expert witness; (2) the jury verdict, including the jury's award of damages, was not supported by the evidence; and (3) additional terms of the district court's order also were not supported by the evidence. Upon our review, we affirm the district court's judgment.

---

[1] In accordance with the naming conventions in the plaintiffs' brief, we refer to Charles Bresler as "Charlie."

3

I.

A.

We state the evidence in the light most favorable to the plaintiffs, the prevailing parties at trial. *See King v. McMillan*, 594 F.3d 301, 306 (4th Cir. 2010). The evidence at trial showed that the parties' dispute involved an estate-planning strategy known as "premium financing." In the particular type of premium financing at issue here, an individual establishes an Irrevocable Life Insurance Trust (ILIT), which acquires one or more life insurance policies and pays the insurance premiums with loans obtained from a third-party lender. Each insurance policy consists of two components: (1) the face value of the policy, and (2) an investment component whereby the death benefit, or the amount that is paid to the insurance beneficiaries when the insured dies, increases if the policies retain excess funds above those required to cover the cost of the insurance and related expenses.

The process of investing in the insurance policies by making payments exceeding the minimum required amount is known as "overfunding." Through this technique, the policy funds grow because the insurance company pays interest on the policies acquired by the ILIT at a specified crediting rate. The goal of overfunding is to borrow from the third-party lender at an interest rate that is lower than the crediting rate, which causes the value of the policies to grow more quickly than the amount of the debt incurred.

During this process of overfunding, the funds in the policies accrue without being subject to taxation.[2] After the insured dies, the insurance company pays a portion of the death benefit from the policies to the third-party lender to repay the ILIT's outstanding loans, and thereafter pays the remainder of the death benefit to the ILIT, also without being subject to taxation. After the loans are repaid, the funds remaining in the ILIT, known as the "net-in-trust," pass tax-free to the ILIT's beneficiaries.

B.

Charlie was a successful entrepreneur in the Washington, D.C. area, and was a co-founder and Chairman of the Board of Directors of Bresler & Reiner, Inc. (B&R), a publicly traded company engaged in real estate development and commercial property management.[3] By 2003, Charlie was 75 years old and had established a net worth of $150 million.

In 2002, Wilmington began development of a premium financing product. Wilmington and B&R had a prior business relationship, and in 2003, a Wilmington employee who had been managing Wilmington's relationship with B&R introduced Edmond Ianni, a Wilmington corporate vice president, to Charlie's attorney, Larry Shaiman. In March 2003, aware of Charlie's significant assets, Ianni and another Wilmington account executive approached Shaiman to discuss the possibility of

---

[2] The funds in the policies that exceed the cost of insurance constitute the "account value."

[3] Charlie's son, Sidney, held various officer-level positions at B&R, and became the company's CEO in 2005.

Wilmington developing for Charlie and Fleur a "tax-saving wealth creation and preservation strategy."

Throughout Shaiman's and Charlie's discussions with Ianni, Charlie expressed reservations about entering into an arrangement that would require him to post a significant amount of collateral. During the course of their conversations, Ianni sent Charlie and Shaiman spreadsheets detailing net-in-trust projections to be derived from a premium financing arrangement. Unlike the spreadsheets Wilmington frequently used with other customers, the spreadsheets Ianni sent to Charlie omitted a column identifying payments of collateral. On November 10, 2003, Ianni sent Shaiman an email stating that any collateral Wilmington required from Charlie would be "minimal," because "the value of the . . . trust's . . . main asset (namely, the significant, growing cash value of the policy, as well as the increasing death benefit) is substantial; that, as you know, will serve as the significant source for satisfaction of the trust's outstanding loan to [Wilmington]."

Eleven days later, on November 21, 2003, Ianni sent Charlie a letter (the November 21 letter) detailing a proposed premium financing arrangement, in which Wilmington would lend to an ILIT established by the Breslers (the Trust) "the annual premium plus allowable overfunding ($5.5 million) to acquire and maintain" several "second-to-die" life insurance policies[4] for Fleur and Charlie with a combined face value of $50 million. The November 21 letter proposed a "blended fixed" crediting rate of

_____

[4] In a "second-to-die" life insurance policy, the insurer pays the death benefit to the policy beneficiaries upon the death of both insureds.

6

5.675 percent, and a "favorable" interest rate of 1.5 percent above LIBOR[5] "on terms required by the lender."  Wilmington projected that after Fleur and Charlie both died, the net-in-trust would be between "$40.6 million to over $45.5 million," with tax savings of between "$24.5 million to over $115 million."

In the November 21 letter, Ianni also attempted to clarify "any misunderstanding of the collateral pledge aspect" of the arrangement.  According to Ianni, Wilmington would require from Charlie a collateral pledge amount of between $2.9 and $4.2 million in the first year.  Ianni indicated that "[t]he amount of the needed collateral going forward obviously will depend in part on the aggregate cash surrender value of the trust's assets (namely, of the insurance) and will be reviewed periodically."  Charlie rejected the requirements for collateral stated in the November 21 letter, based on his understanding that the parties already had agreed that ongoing payments of collateral would not be required.

After further negotiations, in January 2004, Wilmington and Charlie executed three written agreements: (1) an irrevocable life insurance trust agreement (Trust Agreement) establishing the Trust; (2) an investment management agreement establishing an investment management account; and (3) a collateral pledge agreement.  The Trust Agreement named Wilmington as trustee and the five children of Fleur and Charlie, including Sidney, as the Trust's beneficiaries.

---

[5] The London Interbank Offered Rate, or LIBOR, is a fluctuating benchmark interest rate used by several banks around the world.  Investopedia, http://www.investopedia.com/terms/l/ libor.asp (last visited Jan. 27, 2017).

The parties dispute whether Charlie and Ianni ultimately agreed that Charlie would make ongoing collateral payments. However, Charlie made an initial collateral payment to Wilmington in the amount of $3.7 million, for deposit into the investment management account. Wilmington later loaned funds to the Trust to acquire three "second-to-die" life insurance policies for Charlie and Fleur, with a combined face value of $50 million, and overfunded the policies in 2004.

C.

The events culminating in the present litigation occurred in 2005, after the first year of overfunding had concluded.[6] At that time, Wilmington informed Charlie that he was required to post additional collateral before Wilmington would provide another $5.5 million loan to the Trust to cover the cost of the insurance premiums and overfunding contributions. Charlie rejected Wilmington's demand, and maintained that the parties' agreement required only that he provide the initial $3.7 million payment of collateral. Because the parties could not resolve their differences concerning the posting of collateral, Charlie provided an additional $1.3 million in collateral to prevent the policies from lapsing. Those funds were placed in the investment management account.

Accordingly, in 2005, Wilmington lent the Trust $702,338 to cover only the cost of the life insurance premiums, and did not overfund the policies after 2004. However, the parties continued in their efforts to resolve the issue regarding additional collateral payments until 2007, when Wilmington stopped making any payments for the policies.

---

[6] Also in 2005, Wilmington terminated Ianni, stating, among other things, that he had "lost credibility" and had "engaged in questionable sales practices."

At that time, Wilmington and Charlie entered into a series of tolling agreements memorializing their dispute "regarding the process by which the structure and proposal of the insurance program was portrayed by agents of [Wilmington]," and agreeing to maintain their rights to take legal action if negotiations proved unsuccessful.

Around the same time, Ianni sued Wilmington in Delaware state court, seeking allegedly outstanding commissions. In that suit, Wilmington filed a counterclaim asserting that Ianni had misrepresented to certain Wilmington customers, including Charlie, the requirements for posting collateral related to the life insurance trust agreements.

In September 2009, Charlie and his son, Sidney, filed suit against Wilmington in Maryland state court alleging breach of contract, negligence in managing the Trust and the life insurance policies, breach of fiduciary duty, negligent misrepresentation, fraud, and violation of the Delaware Consumer Fraud Act relating to Wilmington's failure to overfund the policies.[7] Wilmington removed the case to federal district court in November 2009, based on diversity jurisdiction under 28 U.S.C. § 1332.

At around the same time, in October 2009, Fleur and Charlie obtained term life insurance policies on Fleur's life (the replacement policies), because Fleur and Charlie

---

[7] Highland Capital Brokerage (Highland), a Highland representative, Ianni, and two other Wilmington employees also were named as defendants in the action. The district court later dismissed the claims against Ianni. The claims against the Highland representative eventually were dismissed, and Highland later was dismissed through a settlement agreement. The other two Wilmington employees remain parties to the litigation.

were concerned that Wilmington would allow their original policies to lapse. The replacement policies carried a fixed death benefit of $17.5 million, had no investment component, and required an annual premium payment of between $1.4 and $1.5 million.

In early 2010, Wilmington resumed lending the Trust enough money to make the minimum premium payments. Charlie died in October 2010, and Sidney and Fleur, as personal representatives of Charlie's estate, became the plaintiffs in the present litigation. In February 2012, Sidney sent a letter to Wilmington demanding that it terminate the investment management agreement and return to Charlie's estate the collateral being held in the investment management account. Sidney relied on a provision in the investment management agreement stating that "the agreement shall be terminated upon [Wilmington]'s receiving written notice of the death of [Charlie]. Upon such termination, [Wilmington] shall deliver to . . . the executor or Administrator of [Charlie]'s estate, . . . all of the property held by it hereunder, if any."

Wilmington refused to return the collateral held in the investment management account. In September 2012, Fleur and Sidney, as co-personal representatives of Charlie's estate, initiated a second lawsuit against Wilmington in Maryland state court, alleging that Wilmington breached an agreement to return funds held in the investment management account to Charlie's estate upon receiving notice of Charlie's death. Fleur and Sidney sought a declaratory judgment, specific performance of Wilmington's contractual obligations, and monetary relief. Wilmington removed the case to federal court, again based on diversity jurisdiction under 28 U.S.C. § 1332. The district court

10

consolidated the two cases, and scheduled a jury trial to resolve only the breach of contract claims against Wilmington.[8]

D.

The consolidated trial began in January 2014, and lasted for three weeks. During the trial, the plaintiffs argued that under an oral agreement between Charlie and Ianni, acting on Wilmington's behalf, the final premium financing arrangement required Charlie to post as collateral only the initial amount of $3.7 million. The plaintiffs asserted that the policies themselves served as the primary collateral for the arrangement. According to the plaintiffs, the parties had agreed that when Fleur and Charlie died, Wilmington's loans would be repaid in full from the proceeds of the death benefit. The plaintiffs contended that Wilmington had received millions of dollars in commissions from the insurance companies, as well as management fees, and had charged the Trust several million dollars in interest. Thus, the plaintiffs argued that Wilmington breached its agreement with Charlie when it demanded additional collateral payments and refused to lend the Trust $5.5 million annually to pay the premiums and overfund the policies through Fleur's life without the payment of further collateral.

In its defense, Wilmington argued that Charlie and Shaiman were experienced businessmen who understood that funds in excess of Charlie's initial pledge of collateral would be required to support the premium financing arrangement. Wilmington asserted

---

[8] The court held in abeyance the non-contract claims pending the outcome of the breach of contract claims. Following the trial, the court decided to continue holding these claims in abeyance pending the outcome of the present appeal, and severed and assigned the claims a new docket number.

that the November 21 letter noted the possibility of future collateral payments, and that Charlie eventually agreed that the amount of additional collateral would be assessed on a yearly basis. Wilmington contended that it never would have agreed, particularly in the absence of a written contract, to lend the Trust $5.5 million every year until Fleur's demise while requiring merely $3.7 million in collateral funding.

In addition to contesting liability, the parties also disputed the existence and proper calculation of damages. In particular, the parties disagreed whether the plaintiffs' expert witness, Robert E. Pugh, had accurately calculated the amount of the net-in-trust.

Pugh, an accountant, presented two sets of damages calculations. In the first set, he calculated the "present shortfall" of the net-in-trust, or the difference between (1) what the net-in-trust would have been at the time of trial in January 2014 had Wilmington lent the $5.5 million annually, and (2) what the existing amount of the net-in-trust was at the time of trial, given that Wilmington had failed to overfund the policies since 2004.[9] Pugh ultimately determined that the value of the "present shortfall" of the net-in-trust was around $10.7 million.

In his second set of damages calculations, Pugh calculated the "future" net-in-trust shortfall over the period between 2014 and the projected end of Fleur's life (future shortfall), which, according to mortality tables developed by the Social Security Administration, and the parties' stipulation, would occur in 2019. Pugh's future shortfall calculation included two scenarios: (1) the future shortfall if Wilmington began

---

[9] We recognize that the net-in-trust will be disbursed to the ILIT's beneficiaries after Fleur dies.

overfunding, or lending, the full $5.5 million per year, between 2014 and 2019; and (2) the future shortfall if Wilmington lent only the minimum amount necessary to maintain the life insurance policies. Accordingly, Pugh made two total net-in-trust shortfall calculations, combining the present shortfall calculation with each of the two different future shortfall estimates. These two total net-in-trust shortfall calculations amounted to: (1) $17.8 million if Wilmington began overfunding the policies immediately and continued to do so through 2019, and (2) around $19.5 million if Wilmington made only the minimum life insurance premium payments through 2019.

Wilmington argued in response that even if it had breached an agreement to overfund the policies, Charlie did not suffer any damages because he had not made any payments himself to maintain the policies. Wilmington also vigorously challenged the accuracy of Pugh's calculations, asserting that they were "riddled with mistakes" and were wholly unreliable.

In a special verdict, the jury concluded that: (1) Wilmington had agreed to lend funds to pay the life insurance policy premiums for the duration of Charlie's and Fleur's lives; (2) Wilmington's commitment was not contingent on Charlie agreeing to post additional annual collateral; (3) Wilmington was not authorized by the parties' agreement to establish an annual amount that Charlie and Fleur would be required to pay as collateral; (4) Wilmington was required to overfund the policies; (5) Wilmington breached the agreement in March 2005 by requiring that Charlie pledge an additional $1.3 million in collateral; (6) Wilmington breached the agreement by failing to make loans each year to pay the premiums on the life insurance policies and by failing to

13

overfund the policies beyond the first year; and (7) Wilmington was obligated to make premium payments for each year that the policies remained in effect.

The jury adopted Pugh's damages calculations, determining that Wilmington owed the plaintiffs either $17.8 million if Wilmington began overfunding the policies immediately, or $19.5 million if Wilmington were to make only the minimum premium payments through 2019. The jury also concluded that Wilmington owed the plaintiffs $3.9 million to reimburse the plaintiffs for part of the costs they incurred in obtaining the replacement policies.

The district court denied Wilmington's post-trial motion for judgment as a matter of law, as well as Wilmington's alternative motions to amend the verdict, to set a new trial, and to require a remittitur. Ultimately, the court entered final judgment ordering Wilmington to continue lending "sufficient funds to pay the minimum premiums required to maintain in force the Policies until the death of Fleur Bresler," to pay the plaintiffs about $23 million in damages, and to return about $5 million in collateral to the Estate.[10] Wilmington noted a timely appeal from the district court's judgment.

## II.

On appeal, we first consider Wilmington's challenges to the admissibility of Pugh's testimony. Wilmington argues: (1) that the district court was required under Rule

---

[10] After the jury rendered its verdict, the district court resolved in the plaintiffs' favor their claim that under the investment management agreement, Wilmington was required to return to the Estate the collateral that was being held in the investment management account.

14

37 of the Federal Rules of Civil Procedure to exclude Pugh's testimony, because the plaintiffs violated certain provisions governing expert witness disclosures; and (2) alternatively, that the court should have excluded Pugh's testimony as analytically invalid under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). We address both of these arguments in turn.

A.

Wilmington asserts that the district court abused its discretion in admitting Pugh's testimony and in allowing his use of a particular exhibit setting forth his calculation methodology. Wilmington primarily contends that the court disregarded the requirements of Rule 26: (1) by permitting the plaintiffs to use the exhibit depicting Pugh's net-in-trust formula and calculations, when this information was submitted after the deadline for such disclosures and was not included in Pugh's expert witness report; and (2) by permitting Pugh to testify regarding his updated calculations.

According to Wilmington, the district court's decision to admit Pugh's testimony disrupted the trial and deprived Wilmington of an adequate opportunity to cross-examine Pugh. Wilmington thus argues that it is entitled to a new trial or, alternatively, to the exclusion of Pugh's testimony and entry of judgment in Wilmington's favor. We disagree with Wilmington's arguments.

We review a district court's discovery rulings, as well as its decision to admit particular expert testimony, for abuse of discretion. *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 260 (4th Cir. 2005) (admission of expert testimony); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 236 (4th Cir. 2004)

15

(discovery rulings). In the absence of a stipulation or court order stating otherwise, Rule 26 requires litigants to provide opposing counsel with a written report prepared and signed by an expert witness who may testify at trial. Fed. R. Civ. P. 26(a)(2)(A)-(B). The expert witness' report must contain, among other things, "a complete statement of all opinions the [expert] witness will express and the basis and reasons for them," "the facts or data considered by the witness in forming them," and "any exhibits that will be used to summarize or support them." Fed. R. Civ. P. 26(a)(2)(B)(i)-(iii). A party must make required expert witness disclosures "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D).

A litigant also is required to supplement information provided in its expert witness report and during the expert witness' deposition "if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A), (e)(2). Unless the court orders otherwise, a party must supplement or correct such information regarding the expert witness' opinion and report at least thirty days before trial. Fed. R. Civ. P. 26(e)(2), (a)(3)(B).

The purpose of Rule 26(a) is to allow litigants "to adequately prepare their cases for trial and to avoid unfair surprise." *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396 (4th Cir. 2014). Accordingly, a party who fails to comply with the expert witness disclosure rules is prohibited from "us[ing] that information or witness to supply

evidence . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

District courts are accorded "broad discretion" in determining whether a party's nondisclosure or untimely disclosure of evidence is substantially justified or harmless. *Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014) (quoting *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003)). In making this determination, district courts are guided by the following factors:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*S. States*, 318 F.3d at 597. The first four factors listed above relate primarily to the harmlessness exception, while the last factor, addressing the party's explanation for its nondisclosure, relates mainly to the substantial justification exception. *Id.* The party failing to disclose information bears the burden of establishing that the nondisclosure was substantially justified or was harmless. *Wilkins*, 751 F.3d at 222 (citations omitted).

Applying these principles, we agree with Wilmington that the plaintiffs did not timely disclose Pugh's net-in-trust formula and calculations. Nevertheless, we conclude that the district court did not abuse its discretion in allowing use of the exhibit and in admitting Pugh's testimony. We ultimately reach this result based on our conclusion that the untimely nature of the plaintiffs' disclosures was harmless and did not materially affect Wilmington's defense in the litigation, including during the trial. The relevant facts in this dispute chart our path leading to this conclusion.

17

In June 2012, the plaintiffs served on the defendants a copy of a report (the June 2012 report) drafted by Pugh, their expert witness on accounting issues. In his report, Pugh presented an opinion regarding the present value[11] of an investment mechanism that would have received an annual contribution of $5.5 million between January 2013 and January 2019, and was subject to a 3.57 percent crediting rate. Pugh qualified his opinion by stating that his calculations were subject to amendment based on information regarding an actual award of damages or other court rulings, as well as on additional data revealed during the litigation about the applicable crediting rates.

Pugh also stated in the June 2012 report that he could provide an opinion regarding the "current valuation of 'underfunding.'" He explained that:

> Plaintiffs seek damages equal to the loss caused by the failure of Wilmington to overfund the three insurance policies . . . . I have been asked to perform calculations commencing in 2005. *I have not performed a calculation which takes into account various costs and expenses related to the insurance policies, nor have I taken into account the payments made to the insurance carriers . . . .*

(emphasis added). Pugh clarified that, instead, he had "calculated the current value of annual payments of $5,500,000 commencing in January 2005 and concluding in January 2012." Additionally, Pugh stated that at trial, he might "use a chart which depicts the variables and the conclusion described in [his] opinion."

On July 3, 2012, the court granted the parties' joint motion requesting an extension of certain deadlines regarding their expert witness disclosures. Under the

---

[11] Pugh explained that a present value is "the current worth of a future sum of money or stream of cash flows given a specified rate of return."

court's order, the parties were required by August 21, 2012 to provide supplemental expert witness reports and corrections to existing expert witness reports. The order further provided that discovery concerning expert witness opinions would conclude on October 23, 2012. Under the court's pretrial procedures, the parties also were required to provide an "update of damages claimed or relief sought" no later than five days before the first day of trial.

Also in July 2012, Wilmington provided the plaintiffs with a copy of a report from Wilmington's expert witness, Kevin Stephens, an accountant. Wilmington had retained Stephens to review the June 2012 report submitted by Pugh. Stephens criticized the June 2012 report for, among other things, its failure to incorporate calculations regarding the financing costs and costs of insurance associated with the premium financing arrangement. Stephens also provided exhibits in his report, which included: (1) financing costs between 2005 and 2020, under various scenarios applying differing financing rates; (2) the "actual cost of insurance and other policy expenses" for all three policies between the years 2005 and 2012[12]; (3) the "guaranteed maximum cost of insurance rates" under each of the three policies; and (4) the projected cost of insurance for the different policies.[13] According to Stephens, these figures should have been deducted from Pugh's figures to calculate the account value, death benefit, and net-in-trust.

_____

[12] Stephens noted that "[a]nnual statements for the various policies we[re] not available for each year."

[13] At trial, Stephens testified that he intended his projected cost of insurance figures "to represent a floor amount," rather than the actual costs of insurance.

19

On October 29, 2013, the parties filed a Joint Proposed Pre-trial Order (Pretrial Order), in which the plaintiffs set forth their estimates of the present and future net-in-trust shortfalls caused by Wilmington's failure to overfund. The Pretrial Order also indicated that Pugh would testify regarding "the reasonableness of the net in trust calculations," and stated that Pugh would "present opinion testimony on the shortfall . . . using the figures provided by [Stephens]." The next day, the court canceled the December 2013 trial date, and set the trial to begin on January 7, 2014.

In early November 2013, the plaintiffs provided Wilmington with a "thumb drive" containing one of the plaintiffs' exhibits, labeled "PX174." Exhibit PX174 depicted Pugh's calculations of the net-in-trust shortfall, or the difference between the net-in-trust allegedly promised by Wilmington and the reduced net-in-trust resulting from Wilmington's breach. Exhibit PX174 also included an interactive spreadsheet. An individual using the spreadsheet could enter values for certain variables to produce an outcome representing the net-in-trust. In addition to crediting rates, the formula in the spreadsheet contained estimates of variables such as the costs of insurance and other expenses, which Pugh had based in part on information provided by Stephens's report. The plaintiffs concede that the formula was not included in the June 2012 report submitted by Pugh.

During a hearing that took place three days before trial on January 4, 2014, the district court declined Wilmington's request to exclude Pugh's testimony on the ground that exhibit PX174 contained a new formula that had not been disclosed before the deadlines for expert witness disclosures. The court noted that Wilmington had use of

20

exhibit PX174, and the formula contained within that exhibit, for well over one month before the hearing, and that the court would have permitted Wilmington to depose Pugh again had Wilmington requested to do so.

The case proceeded to trial. Before Pugh was called to testify in the plaintiffs' case-in-chief, the plaintiffs presented the testimony of Patricia Wilson, a Wilmington employee. Wilson testified regarding the value of the premium financing investment, stating that the actual loan balance on the investment was $13.6 million, and that the current insurance death benefit was around $50 million.

After this testimony, the plaintiffs presented Pugh as their expert witness on Friday, January 17, 2014. When Pugh stated that he was capable of updating his spreadsheet to incorporate Wilson's figures, Wilmington objected. At that point, the district court limited Pugh's testimony to the information he had provided before trial, but allowed him to inform the jury that application of Wilson's figures would result in a decrease of the amount of damages Pugh had calculated.

As Pugh's testimony unfolded, however, it became clear that Pugh needed to make additional changes to his calculations in light of Wilson's testimony, in order to calculate more accurately the net-in-trust shortfall. When Pugh started to testify regarding future shortfall estimates, the district court stopped the questioning, stating that the testimony had devolved into "hopeless confusion."[14] The court ruled that Pugh needed to make changes to his spreadsheet by entering the information provided during Wilson's

---

[14] The court made this remark to counsel during a bench conference.

21

testimony and making any other necessary updates. The court told counsel that the court was "concerned about [the] jury understanding what's happening in [this] case."

Accordingly, after Wilmington did not object to Pugh being excused as a witness to "work on [his] numbers" over the weekend before resuming his testimony, the plaintiffs proceeded in their case-in-chief and called their next witness to testify. After the weekend, the plaintiffs recalled Pugh to present his revised calculations. Pugh explained the changes he had made to his figures in response to some errors identified by defense counsel, and in response to financial information presented by Wilson in her trial testimony, including the actual loan balance and death benefit identified by Wilson.

Wilmington subjected Pugh to lengthy and rigorous cross-examination on both his original calculations and his amended figures, questioning him about matters including his choice of values for interest rates and the costs of maintaining the insurance policies. Wilmington did not present its own damages calculation.

Given this sequence of events, we agree with Wilmington that the plaintiffs violated the disclosure requirements for expert witnesses in Rule 26. *See* Fed. R. Civ. P. 26(a)(2)(D), (a)(3)(B). Exhibit PX174 contained a net-in-trust formula and associated calculations that Pugh considered in forming his ultimate opinion, which therefore should have been included in the June 2012 report. *See* Fed. R. Civ. P. 26(a)(2)(B)(i)-(iii). Even if we were to view exhibit PX174 as being a supplement to the June 2012 report, that exhibit was not provided to Wilmington until November 2013, well beyond the parties' agreed deadline. *See* Fed. R. Civ. P. 26(a)(2)(D), (a)(3)(B).

Nonetheless, upon review of the *Southern States* factors, we conclude that the district court did not abuse its discretion in admitting Pugh's testimony, because the plaintiffs' noncompliance with Rule 26 was harmless in the context of the events that transpired.[15] *See S. States*, 318 F.3d at 597. With regard to the first *Southern States* factor, we observe that any surprise resulting from the plaintiffs' belated disclosure of exhibit PX174 and the net-in-trust calculation was minimal. Wilmington had been notified in a timely manner in the June 2012 report that Pugh would testify regarding the value that the policies would have yielded if Wilmington had met its overfunding commitments through 2019. The June 2012 report also stated that depending on additional information Pugh could obtain at a later date, he might use an updated chart or spreadsheet in the course of the litigation. Thus**,** Wilmington was aware from the June 2012 report that damages related to the plaintiffs' anticipated net-in-trust was a central issue in the case, and that Wilmington's decision whether to overfund the policies necessarily would impact the value of the policies and, consequently, the amount of the net-in-trust.

Also, it was undisputed that the very goal of the premium financing arrangement, which Wilmington emphasized in its proposals to Charlie, was to produce a sizable net-in-trust upon Fleur's and Charlie's deaths. Pugh ultimately updated his calculations from the June 2012 report. Some of these updates were reflected in exhibit PX174, in which

---

[15] In addressing whether to admit the plaintiffs' delayed disclosures, the district court did not discuss individually the factors enumerated in *Southern States*. However, the district court was not required to do so. *Wilkins*, 751 F.3d at 222.

Pugh incorporated certain cost estimates and other information included in Stephens's report. In addition, Pugh's testimony reflected changes made to incorporate information that Wilson, Wilmington's own employee, presented in her testimony.

And, decisively, the collective result of these changes was a *decrease* in the amount of damages calculated. Thus, the present case does not involve a situation in which a defendant was "blindsided" by an expert witness' testimony that damages would be greater, or from a different source, than the witness earlier had indicated. Pugh's updated calculations actually decreased his estimates regarding the net-in-trust shortfall. Accordingly, we conclude that any surprise to Wilmington caused by the plaintiffs' belated disclosure of exhibit PX174, and Pugh's related testimony regarding the net-in-trust shortfall, was inconsequential. *See Howe v. City of Akron*, 801 F.3d 718, 748-50 (6th Cir. 2015) (concluding that plaintiffs' late disclosure of expert witness' back-pay calculations was harmless, in part because defendant possessed information relevant to calculations and knew plaintiffs were reconsidering their calculations, which plaintiffs had realized might be flawed).

We next consider the second *Southern States* factor, and address Wilmington's ability to cure any purported surprise. *See* 318 F.3d at 597. We observe that Wilmington had access to exhibit PX174 and its associated net-in-trust formula for nearly two months before the trial began. During that period, Wilmington did not seek to depose Pugh or to take any other steps to mitigate the purported surprise caused by the plaintiffs' delayed disclosure of the net-in-trust formula. Moreover, the record before us does not indicate that an earlier disclosure of exhibit PX174 and Pugh's updated calculations would have

24

enabled Wilmington to conduct additional cross-examination of Pugh or to introduce competing evidence at trial.[16]  *See Davis v. U.S. Bancorp*, 383 F.3d 761, 765 (8th Cir. 2004); *see also Reese v. Herbert*, 527 F.3d 1253, 1265 (11th Cir. 2008) ("[T]he expert disclosure rule is intended to provide opposing parties [a] reasonable opportunity to prepare for effective cross examination and . . . arrange for expert testimony from other witnesses." (internal quotation marks and citations omitted)).  Thus, the record does not show that Pugh's supplementary calculations and their timing affected Wilmington's ability to conduct its defense in any material respect.

The third *Southern States* factor is "the extent to which allowing the evidence would disrupt the trial."  318 F.3d at 597.  The record before us does not indicate any significant disruption caused by the district court's decision to admit exhibit PX174 and to permit Pugh to testify concerning his updated calculations.  *Cf. S. States*, 318 F.3d at 598 (agreeing with district court's finding that allowing "continuance to accommodate [expert witness'] third opinion would have significantly disrupted the trial," because continuing and presenting case anew would render "much of the parties' trial preparation . . . obsolete").

We observe pursuant to the fourth *Southern States* factor that Pugh's testimony was vital evidence, because it provided the basis for the jury's damages award.  *See id.* at

---

[16] Wilmington did not present its own damages calculation to the jury, relying instead on its attempts to discredit Pugh's calculations.  Notably, Wilmington does not contend that its failure to present its own calculations was a result of the plaintiffs' delayed disclosures, rather than a strategic decision that Wilmington made during the course of the litigation.

597. And, with regard to the fifth *Southern States* factor, the plaintiffs have not provided a sufficient explanation for their delay in disclosing exhibit PX174 in a timely manner. *See id.* at 598-99. These two factors weigh in Wilmington's favor in the *Southern States* analysis. Nonetheless, given that any surprise to Wilmington at trial was minimal, and that Wilmington had an opportunity to cure any surprise from exhibit PX174 that may have affected the preparation of its defense, we cannot say that the district court abused its discretion in declining to exclude exhibit PX174 and Pugh's testimony under Rule 37. *See id.* at 597 (recognizing the district court's "broad discretion to determine whether a nondisclosure of evidence is substantially justified or harmless" under Rule 37(c)(1)).

## B.

We next address Wilmington's contention that the district court should have excluded Pugh's testimony under the principles expressed by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Wilmington argues that Pugh's testimony was inadmissible because his calculations: (1) erroneously incorporated cost of insurance values from Stephens's model to calculate the "with overfunding" net-in-trust shortfall up to the date of trial; (2) used "an invalid interest spread" to project the future net-in-trust shortfall; and (3) improperly discounted the future net-in-trust shortfall to present value.

We find no merit in Wilmington's arguments. We review for abuse of discretion a district court's evidentiary rulings regarding the reliability of an expert opinion. *Bryte ex rel. Bryte v. Am. Household, Inc.*, 429 F.3d 469, 475 (4th Cir. 2005). We conclude that

26

although Pugh's testimony was unclear at various points during the trial, the district court did not abuse its discretion in declining to exclude Pugh's testimony under *Daubert*.[17]

Under Rule 702 of the Federal Rules of Evidence, an expert witness' testimony must, among other things, be "based on sufficient facts or data," and must be "the product of reliable principles and methods." Fed. R. Evid. 702(a)-(d). Courts are required to act as "gatekeepers" to ensure that expert testimony is relevant and reliable. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (citing *Daubert*, 509 U.S. at 588).

In fulfilling its gatekeeping function, a district court "must conduct a preliminary assessment" to determine whether the methodology underlying the expert witness' testimony is valid. *Id.* (internal quotation marks omitted) (quoting *Daubert*, 509 U.S. at 592-93). District courts have "considerable leeway" in determining the manner in which they evaluate an expert witness' reliability. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). In assessing the validity of the methodology employed by a proposed expert witness, a court may consider whether the expert witness' theory or technique: (1) "can be or has been tested"; (2) "has been subjected to peer review and publication"; (3) "has a high known or potential rate of error"; and (4) is generally accepted "within a relevant scientific community." *Cooper*, 259 F.3d at 199.

---

[17] Wilmington also asserts that, in forming his opinions, Pugh impermissibly relied on Randy Whitelaw, a professional in the insurance industry with experience in premium financing, because Whitelaw did not testify and Wilmington thus was unable to cross-examine him. We disagree. While an expert witness may not bolster the reliability of his own opinion by testifying about a non-testifying expert witness' credentials and opinion, *see United States v. Tran Trong Cuong*, 18 F.3d 1132, 1144 (4th Cir. 1994), Pugh relied on Whitelaw for information about general premium financing concepts, and did not rely on the opinions Whitelaw prepared for the present litigation. *See* Fed. R. Evid. 703.

To determine whether an opinion of an expert witness satisfies *Daubert* scrutiny, courts may not evaluate the expert witness' conclusion itself, but only the opinion's underlying methodology. *TFWS, Inc. v. Schaefer*, 325 F.3d 234, 240 (4th Cir. 2003). Moreover, "questions regarding the factual underpinnings of the [expert witness'] opinion affect the weight and credibility" of the witness' assessment, "not its admissibility." *Structural Polymer Grp. v. Zoltek Corp.*, 543 F.3d 987, 997 (8th Cir. 2008).

In the present case, Wilmington's *Daubert* challenge amounts to a disagreement with the values Pugh chose to assign to certain variables, including the cost of insurance and future interest rates. While Wilmington may have preferred that Pugh use higher costs of insurance in his formula, along with other values more favorable to Wilmington, Pugh's failure to do so did not require the district court to exclude Pugh's opinion under *Daubert*. *Cf. Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 143 (4th Cir. 1994) (holding that district court abused its discretion in admitting expert opinion that conflicted directly with uncontroverted record evidence). Rather, such challenges to the accuracy of Pugh's calculations "affect the weight and credibility" of Pugh's assessment, not its admissibility. *See Zoltek Corp.*, 543 F.3d at 997.

III.

Wilmington also raises several arguments challenging the sufficiency of the evidence. Initially, Wilmington asserts that the evidence was insufficient to support the jury's finding that Charlie did not agree to provide additional collateral after the initial

28

$3.7 million payment. According to Wilmington, there could not have been a "meeting of the minds" between Charlie and Wilmington on this issue, because an agreement to lend Charlie $5.5 million annually without requiring him to make additional payments of collateral was "too good to be true." Wilmington also maintains that the evidence did not support the jury's conclusion that Wilmington agreed to overfund the policies by lending the Trust $5.5 million annually. Finally, Wilmington contends that the evidence failed to support the court's order requiring Wilmington to return to Charlie's estate the initial $3.7 million collateral payment, as well as the second collateral payment of $1.3 million made in 2005. Again, we disagree with Wilmington's arguments.

We review de novo the district court's denial of Wilmington's motion for judgment as a matter of law, and consider the evidence in the light most favorable to the plaintiffs, the prevailing parties at trial. *See Myrick v. Prime Ins. Syndicate, Inc.*, 395 F.3d 485, 489-90 (4th Cir. 2005). We "draw all reasonable inferences in [the plaintiffs'] favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). Entry of judgment as a matter of law is appropriate only if the evidence is legally insufficient to support the jury's verdict. *Id.*; *see* Fed. R. Civ. P. 50(a)-(b). Thus, we must affirm the district court's denial of Wilmington's motion if reasonable minds could differ regarding the findings contained in the jury's special verdict. *Dennis*, 290 F.3d at 645.

Under Delaware law, a breach of contract claim has three elements: (1) a contractual obligation; (2) the defendant's breach of that obligation; and (3) damage to

29

the plaintiff caused by the breach.[18] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003). In interpreting contractual provisions, Delaware courts seek to uphold the parties' intention, looking first to the four corners of the agreement to determine whether that intention is evident from the express language in the contract. *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009). Delaware courts accord unambiguous terms their ordinary meaning. *Id.*

We reject Wilmington's claim that there could not have been a "meeting of the minds" between Charlie and Wilmington, because the premium financing arrangement was "too good to be true." As an initial matter, we do not dispute the principle that if an agreement's terms "are so vague that a [c]ourt cannot determine the existence of a breach, then the parties have not reached a meeting of the minds," and no agreement exists. *Cont'l Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1230 (Del. Ch. 2000). However, Wilmington has not identified any terms of the premium financing arrangement that were "so vague" that they rendered the jury unable to determine whether an agreement existed and, if so, whether a breach had occurred.

We agree with the district court that the plaintiffs presented sufficient evidence for the jury to conclude that Wilmington had agreed that Charlie would not be required to post any collateral other than the initial $3.7 million. In his deposition received at trial,

---

[18] The Trust Agreement contains a choice of law provision identifying Delaware law as governing contract disputes, and the parties agree that Delaware law governs our resolution of the breach of contract claims, including the parties' disputes regarding damages. Accordingly, we apply Delaware law here. *See Chorley Enters., Inc. v. Dickey's Barbecue Restaurants, Inc.*, 807 F.3d 553, 563 n.11 (4th Cir. 2015).

Charlie testified unequivocally that he and Ianni agreed orally that additional collateral payments would not be required.[19] Given the special verdict returned by the jury, we conclude that the jury accepted Charlie's testimony on this issue as credible, and we will not reassess that credibility determination on appeal.

Additionally, evidence from other witnesses supported Charlie's testimony on this point. This evidence included testimony from a Wilmington employee that unlike the spreadsheets Wilmington used with other customers, the spreadsheets Ianni sent to Charlie omitted a column identifying collateral payments. Moreover, the collateral pledge agreement signed by Charlie eliminated certain provisions contained in Wilmington's standard templates for such agreements, and lacked any provision subjecting Charlie to ongoing collateral payment obligations.

The record also contains documentary evidence demonstrating that Ianni's proposals did not mention ongoing collateral payment obligations, and that Ianni was aware that Charlie was unwilling to agree to any arrangement that would require him to post significant additional collateral. The jury also heard unrefuted evidence that Wilmington had filed a counterclaim in a separate civil action Ianni had brought against Wilmington. In that counterclaim, Wilmington alleged, in part, that Ianni had misrepresented to Charlie the requirements for posting collateral. From this extensive evidence, the jury reasonably could have concluded that to secure Charlie's business, a Wilmington vice president, Ianni, had agreed that Charlie would not have to make annual

_____

[19] Because Charlie died before the trial began, portions of his videotaped deposition, taken in August 2010, were played for the jury at trial.

31

collateral payments as security for Wilmington's commitment to overfund the policies. *See Myrick*, 395 F.3d at 489-90; *Dennis*, 290 F.3d at 645.

Our conclusion is not altered by Wilmington's suggestion that Charlie should have known that Ianni lacked the authority to waive annual collateral payments. When Wilmington promoted Ianni to the position of vice president, Wilmington emphasized that Ianni should be "presented and perceived as . . . someone with credibility and in whom [prospective clients] . . . can place their confidence." Wilmington also had recognized Ianni for his success in selling premium financing products, referring to him at an annual meeting as "Moses parting the Red Sea" because of his successful promotion of lucrative premium financing products. In light of this evidence, a reasonable jury could infer that Wilmington had conferred extensive discretionary authority on Ianni, and that Charlie had no reason to think otherwise. *Cf. Limestone Realty Co. v. Town & Country Fine Furniture & Carpeting, Inc.*, 256 A.2d 676, 679 (Del. Ch. 1969) (concluding that no binding contract was created when offeree had cause to question offeror's authority, and "accept[ed] an offer which he should have known was unintended and on its face was too good to be true").

We also reject Wilmington's contention that the evidence failed to support the jury's conclusion that Wilmington agreed to overfund the policies by lending $5.5 million annually to the Trust. Documentary evidence at trial overwhelmingly proved that Wilmington had agreed to make annual loans in that amount to the Trust. A multitude of letters and spreadsheets that Ianni sent to Shaiman and Charlie, as well as Wilmington's internal documents from November 2003, referenced annual loans to the Trust in the

32

amount of $5.5 million. Also, Ianni's November 21 letter, which detailed key terms of the premium financing arrangement that ultimately was executed, stated that Wilmington "would loan to the trust the annual premium plus allowable overfunding ($5.5 million) to acquire and maintain that insurance in [the Trust]." A letter that Ianni sent to Shaiman in February 2005 similarly referenced Wilmington's obligation to lend $5.5 million annually to the Trust. Viewing this evidence in the light most favorable to the plaintiffs, the jury had an ample basis for concluding that Wilmington had agreed to overfund the policies by lending $5.5 million annually to the Trust. *See Myrick*, 395 F.3d at 489-90.

We next consider Wilmington's challenge to the district court's decision ordering Wilmington to return to the Estate Charlie's initial collateral payment of $3.7 million, as well as his later payment of $1.3 million in collateral made to prevent the insurance policies from lapsing. Because the district court resolved this issue post-trial, we review the supporting factual findings for clear error and the court's conclusions of law, including contract construction, de novo. *See Roanoke Cement Co. v. Falk Corp.*, 413 F.3d 431, 433 (4th Cir. 2005).

We find no error in the district court's determination. As the court explained, the plain language of the investment management agreement required that Wilmington return all collateral upon Charlie's death, stating that once Wilmington received notice of Charlie's death, Wilmington "shall deliver to [Charlie], or the executor or administrator of [Charlie's] estate, . . . all of the property held by [Wilmington] hereunder." Also, the jury had determined in its special verdict that Charlie was not required by the parties' agreement to make additional collateral payments. Thus, based on the court's

33

interpretation of the parties' contract and the jury's well-supported factual finding that Charlie was not required under the parties' agreement to make additional collateral payments, the court properly ordered Wilmington to return to the Estate the collateral payments that Charlie made in the total amount of $5 million. *See Paul*, 974 A.2d at 145.

In sum, we reject Wilmington's challenges to the sufficiency of the evidence adduced at trial. We also affirm the district court's order requiring Wilmington to return to the Estate the $5 million in collateral payments that Charlie had made.

IV.

We next consider Wilmington's challenges to the jury's damages award. Wilmington contends that the evidence did not support the jury's finding that the plaintiffs were entitled to receive: (1) the $19.5 million award of damages representing the net-in-trust shortfall through 2019, if Wilmington were to make only the minimum premium payments through that date; and (2) an additional award of $3.9 million to compensate the plaintiffs for costs incurred in their purchase of the replacement policies.

In considering these issues, we apply a well-established standard of review. We will affirm a district court's decision confirming a jury's award of compensatory damages unless the verdict was contrary to the clear weight of the evidence, was based on false evidence, or would result in a miscarriage of justice. *McMillan*, 594 F.3d at 313-14 (citation omitted).

A.

With regard to the damages award for the net-in-trust shortfall, Wilmington maintains that the plaintiffs had not suffered any damages at the time of trial and, thus, that any purported damages were merely speculative in nature. Wilmington asserts that "[a]ny Net-in-Trust shortfall payable at death is fictional, as it is based upon the timing of a death of an individual still alive," namely, Fleur. Wilmington also argues that even if it breached an agreement to overfund the policies, there were too many unknown variables preventing the jury from making a reasonable estimate of the ultimate net-in-trust amount. Accordingly, Wilmington maintains that the plaintiffs must wait until Fleur dies to recover damages for any shortfall to their net-in-trust.[20] We are unpersuaded by Wilmington's arguments.

Under Delaware law, a non-breaching party is entitled to those damages that arise naturally from the breach or that were reasonably foreseeable at the time the parties entered into the contract. *Paul*, 974 A.2d at 146. As the Supreme Court of Delaware recently explained, expectation damages, or damages representing the parties' reasonable expectation of the value of the contract at the time they entered into the contract, constitute the standard remedy for a breach of contract claim. *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1130, 1132 (Del. 2015) (citations omitted). Expectation damages typically provide the non-breaching party with the amount of

---

[20] Wilmington does not challenge the court's order of specific performance, which requires Wilmington to lend to the Trust sufficient funds to pay the minimum premiums required to maintain the policies through Fleur's life.

money that would put him in the same position as if the breaching party had fulfilled his contractual obligations. *Id.* at 1130.

The non-breaching party must prove expectation damages to a reasonable degree of certainty, and may not recover damages that are speculative or uncertain. *Id.* at 1130-31 (citations omitted). Once the non-breaching party establishes the fact of damages to a reasonable degree of certainty, the amount of damages may be established with less precision. *Id.* at 1131.

We conclude that the plaintiffs proved the existence of damages to a reasonable degree of certainty and adequately proved the amount of damages awarded.[21] *See id.* Wilmington's failure to overfund the policies caused immediate damages, because the account value of the policies and, therefore, the expected death benefit, failed to grow as anticipated. Pugh projected a $19.5 million net-in-trust shortfall if Wilmington paid the minimum cost of the premium payments through 2019. Pugh's figures relied, in part, on estimates regarding variables such as crediting rates, interest rates, and costs of insurance, as well as mortality tables estimating that Fleur would die in 2019. While Wilmington may disagree with the values Pugh selected in generating his calculations, this disagreement did not render the plaintiffs' damages speculative. Moreover, Wilmington stipulated to Fleur's life expectancy, and did not object when the court took judicial

---

[21] We reject Wilmington's argument, raised for the first time on appeal, that the plaintiffs are not entitled to damages because the plaintiffs failed to demonstrate an "injury." Despite Wilmington's attempt to insert an "injury" element into a breach of contract claim, under Delaware law a breach of contract claim does not include a distinct "injury" element. *See H-M Wexford LLC*, 832 A.2d at 140.

36

notice of the mortality tables that Pugh used in his calculations.[22]    Given these concessions, Wilmington may not now assert that the plaintiffs' damages are speculative because the date of Fleur's death is uncertain.

Pugh's estimates regarding such factors as interest rates, crediting rates, and costs of insurance also did not render his testimony speculative.  Reasoned assumptions and estimates about factors such as these are permitted in a breach of contract case involving expectation damages, and may be attacked by a defendant through cross-examination or through the presentation of contrary evidence.  *See Siga Techs.*, 132 A.3d at 1111, 1122-24, 1135-37.    Here, Wilmington thoroughly cross-examined Pugh regarding his calculations, and declined to exercise its right to present contrary expert witness testimony.

We find no merit in Wilmington's separate assertion that the holding in *American General Corp. v. Continental Airlines Corp.*, 622 A.2d 1 (Del. Ch. 1992), requires us to conclude that the damages award for the net-in-trust shortfall was speculative.  There, unlike in the present case involving the future event of Fleur's death, the court was presented with a contingency that may never have occurred.  The court in *American General* was required to consider the damages, if any, that American General

---

[22] In its brief, Wilmington relies on *In re New York, N.H. & H.R. Co.*, 92 F.2d 428 (2d Cir. 1937), to argue that Pugh's use of mortality tables for his damages calculation "was speculative and improper."  As noted above, Wilmington did not object when the court took judicial notice of the mortality tables, and Wilmington also conceded at oral argument that it is appropriate for courts to use mortality tables in calculating damages.  We therefore decline to address Wilmington's challenge to Pugh's use of mortality tables in calculating the net-in-trust shortfall damages.  *See Weidman v. Exxon Mobil Corp.*, 776 F.3d 214, 220 (4th Cir. 2015).

Corporation (American), was entitled to receive resulting from the failure of Continental Airlines Corporation (Continental) to provide American the same stock options that Continental provided to its own employees, in connection with a merger agreement between Continental and its majority stockholder, Texas Air Corporation (Texas Air). *Id.* at 3, 5.

A central issue in making this determination was whether damages should be measured from the date that Texas Air stockholders elected to approve the employee stock option plan, or from the merger date, which took place three months before Texas Air stockholders approved the employee option plan. *Id.* The court concluded that it was appropriate to measure damages from the date on which Texas Air stockholders approved the employee option plan, because American employees did not have any right to receive those benefits until after the contingent event of Texas Air stockholder approval had occurred. *Id.* at 7-8.

This reasoning in *American General* is inapposite to our present determination. While the contingency in *American General*, namely, the stockholders' approval of the employee option plan, may never have materialized, the event at issue in the present case, that of Fleur's death, is certain to occur. Therefore, the net-in-trust shortfall at issue here could reasonably be estimated because it was not measured with reference to a speculative future event, but with regard to the occurrence of a certain event in a year stipulated by the parties. Accordingly, we disagree with Wilmington's argument that the holding in *American General* prohibits the plaintiffs from recovering net-in-trust damages until Fleur dies.

We therefore conclude that the plaintiffs provided sufficient proof of the existence and amount of their net-in-trust shortfall damages, which represented the amount of money required to place the plaintiffs in the position they reasonably expected to have achieved had Wilmington overfunded the policies as promised. *See Siga Techs.*, 132 A.3d at 1130, 1131 n.128 ("[E]stimates that lack mathematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages." (citation omitted)); *see also* 24 Williston on Contracts § 64:10 (4th ed. 2016) ("Most contracts are entered into with the view to future profits, and such profits are in the contemplation of the parties; and, so far as they can be properly proved, they may form the measure of damage."). Accordingly, we affirm the portion of the damages award representing the net-in-trust shortfall, because that award was not reached against the clear weight of the evidence, and would not result in a miscarriage of justice. *See McMillan*, 594 F.3d at 313-14.

B.

Finally, we address Wilmington's challenge to the jury's award of $3.9 million for costs incurred by the plaintiffs in obtaining the replacement policies. Wilmington asserts that the plaintiffs were not entitled to these damages, because the plaintiffs "incurred these costs to protect against *losing* their claims already in litigation."[23] Wilmington's contention is unavailing.

---

[23] We decline to address Wilmington's argument that these damages were improper under a theory of anticipatory repudiation. Wilmington raises this argument for the first time on appeal, and it is therefore waived. *See Weidman*, 776 F.3d at 220.

39

In reaching our conclusion, we are guided by the principle, noted above, that a non-breaching party is entitled to damages that were reasonably foreseeable at the time the parties entered into the contract. *Paul*, 974 A.2d at 146. In the present case, Fleur and Charlie obtained replacement life insurance policies on Fleur's life in October 2009, because Wilmington had failed to overfund the policies since 2004, and Fleur and Charlie were concerned that Wilmington would allow their original policies to lapse. The replacement policies carried a fixed death benefit of $17.5 million. From 2009 through 2014, when the trial took place, Fleur had paid around $7.75 million in premiums for the replacement policies. A witness for Wilmington estimated that the market value of Charlie's and Fleur's policies was around twenty-two percent of the policies' face value, or around $3.85 million. Thus, as the district court explained, subtracting the $3.85 million market value of the policies from the $7.75 million in premiums that Fleur paid from 2009 through 2014 yielded $3.9 million, which is the amount that the jury awarded to the plaintiffs for damages associated with obtaining the replacement policies.

We conclude that it was reasonably foreseeable at the time the parties entered into the premium financing arrangement that if Wilmington were to breach the agreement by failing to overfund the policies, the Breslers would need to seek replacement policies to secure the insurance benefits they had expected to realize but would no longer receive as a result of Wilmington's breach. *See id.* at 146-47. We therefore hold that the jury properly awarded the plaintiffs $3.9 million in consequential damages, and that this

40

award was neither contrary to the clear weight of evidence nor one that would cause a miscarriage of justice.[24] *McMillan,* 594 F.3d at 313-14.

V.

For these reasons, we affirm the district court's judgment.

*AFFIRMED*

---

[24] We also note that Wilmington fails to cite any authority to support its contention that the plaintiffs were not entitled to the $3.9 million award for costs incurred obtaining the replacement policies.

WYNN, Circuit Judge, concurring in part and dissenting part:

I agree with the majority opinion that sufficient evidence supported the jury's conclusions (1) that Defendant Wilmington Trust Company ("Wilmington Trust") and Charlie Bresler ("Charlie") entered into a "premium financing" contract; (2) that, pursuant to that contract, Wilmington Trust agreed to lend $5.5 million per year to an irrevocable trust established by Charlie to pay premiums on and "overfund" three life insurance policies purchased by the trust; and (3) that the contract required that Wilmington Trust return collateral posted by Charlie upon Charlie's death. I also agree with the majority opinion that disclosures and damages testimony by Plaintiffs' accounting expert violated Federal Rule of Civil Procedure 26 in numerous ways.

Notwithstanding Plaintiffs' myriad violations of Rule 26, the majority opinion concludes that the district court did not abuse its discretion in admitting the damages testimony on grounds that Plaintiffs' noncompliance was "harmless." *See* Fed. R. Civ. P. 37(c)(1). But the district court *never concluded* that Plaintiffs failed to comply with Rule 26, and therefore *never exercised its discretion* to admit the evidence on harmlessness grounds. Accordingly, plenary, rather than abuse-of-discretion, review applies to the district court's decision to admit the damages testimony. Indeed, the application of deferential review is particularly unwarranted because Plaintiffs repeatedly mislead, intentionally or otherwise, the district court regarding information essential to determining whether Plaintiffs complied with Rule 26 and whether any violation of Rule 26 was harmless. In so doing, Plaintiffs deprived the district court of the opportunity to

42

exercise its discretion in an informed manner, undermining the rationale for applying abuse-of-discretion review on appeal.

Under this Court's precedent, the damages testimony—which Plaintiffs first disclosed *after* the close of expert discovery, *after* the court had ruled on the parties' motions for summary judgment, and *after* the deadline for submitting pre-trial motions— was not harmless. *See Wilkins v. Montgomery*, 751 F.3d 214, 223 (4th Cir. 2014). On the contrary, Plaintiffs' noncompliance with Rule 26 deprived Wilmington Trust of the opportunity to depose the expert regarding his damages opinion, to prepare rebuttal reports, and, therefore, to effectively challenge the expert's damages testimony at trial— testimony from which the jury directly drew its multi-million dollar damages award. "[I]t would be a miscarriage of justice to allow [the] award to stand, where that award was brought about by plaintiffs' misleading the court." *Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13, 37 (1st Cir. 2006). Accordingly, I dissent.

I.

A.

Charlie Bresler co-owned a successful real estate development company. By 2003, Charlie was nearing the end of his life and had a net worth in excess of $150 million. At the same time, Wilmington Trust was trying to expand its personal trust, investment services, and wealth management businesses. As part of that effort, Wilmington Trust approached Charlie with various "premium financing" proposals, which Wilmington Trust touted as vehicles for Charlie to minimize taxes on his estate.

43

Under the premium financing plans that Wilmington Trust proposed, Wilmington Trust would make loans to a tax-sheltered irrevocable trust. The trust would then use the proceeds of the loans to purchase, and pay premiums on, second-to-die life insurance policies, which would pay out on the death of Charlie's wife, Fleur. In addition to making the loans, Wilmington Trust also would administer the trust.

The life insurance policies at issue have two components: a face value and an investment account. The face value is a set amount that the policy will pay upon the insured's death if the owner pays the premium each year. The owner of the policy can also "overfund" the policy by contributing money into the investment account above and beyond the annual premium, which then increases the death benefit. Overfunding contributions also increase the cash value of the policy at a faster rate than premium payment alone. Under Wilmington Trust's proposed plan, the trust would use the proceeds from the death benefit and investment account, paid out to the trust upon Fleur's death, to repay Wilmington Trust's loans with interest.

In November 2003, Charlie and Wilmington Trust agreed on a multi-million dollar premium financing plan, but the parties never reduced their agreement to writing. The parties agree that under the oral arrangement Wilmington Trust would lend the trust money to pay premiums on three second-to-die life insurance policies with a combined face value of $50 million and payable to the trust on Fleur's death. Plaintiffs asserted—and the jury found—that Wilmington Trust agreed to lend the trust $5.5 million each year to pay premiums on the policies and, if the annual premiums were less than the $5.5 million annual lending commitment, to overfund the policies.

44

In 2004, in advance of its first $5.5 million loan to the trust, Wilmington Trust requested, and Charlie posted, $3.7 million in collateral. In 2005, Wilmington Trust requested that Charlie post additional collateral before Wilmington Trust made its second $5.5 million loan to the trust. Charlie responded that the premium financing agreement only contemplated the original $3.7 million in collateral and threatened legal action if Wilmington Trust declined to lend to the trust. In order to avoid having the policies lapse, Charlie nonetheless posted an additional $1.3 million in collateral. The jury found that the premium financing agreement did not require Charlie to pledge this, or any, additional collateral.

On September 16, 2009, Charlie brought suit in Maryland state court against Wilmington Trust and several individuals and entities not party to this appeal. Wilmington Trust removed the case to federal court. The complaint asserted twelve causes of action, including claims for negligence, breach of fiduciary duty, breach of contract, fraud, and civil conspiracy. Only the breach of contract claim proceeded to trial.

B.

The district court entered the operative scheduling order on July 3, 2012. Under that order, Wilmington Trust had to file its Rule 26 expert reports by July 16, 2012. Plaintiffs designated Robert Pugh, CPA, as an expert in tax and present-value calculations and submitted his report on June 6, 2012. Pugh's five-and-a-half page report provided four "calculations." J.A. 701–07. The second and third calculations—entitled "present value" and "current valuation of underfunding"—estimated the value, as of the

45

date of the report, of Wilmington Trust's alleged $5.5 million annual lending commitment during Fleur's anticipated lifespan. During his deposition, Pugh explained that these calculations involved "basically just taking money over time at a certain interest rate and calculating what it would be today." J.A. 745–46.

To that end, the "present value" calculation set forth the formula for discounting money to present value and then, using an estimate of interest rates, calculated the present value of the $5.5 million lending commitment at $33.5 million for 2013 to 2019, the period running from the date of trial to the end of Fleur's expected lifespan. The "current value of underfunding" formula "calculated the current value of annual payments of $5,500,000 commencing in January 2005 and concluding in January 2012." J.A. 3262. Accordingly, Pugh's calculations *assumed* that the *entire* $5.5 million loan would be used to overfund the policies, notwithstanding (1) that the premium financing agreement between Wilmington Trust and Charlie required that a portion of the loan be used to pay the premiums on the life insurance policies and (2) that Wilmington Trust never breached its obligation to lend the trust sufficient funds to pay the premiums required to keep the policies in force. Pugh's report acknowledged that he had "not performed a calculation which takes into account various costs and expenses related to the insurance policies, nor [had he] taken into account the payments made to the insurance carriers, the commissions paid by the insurance carriers, or the effect of underfunding on the cash values or the cash surrender values of the policies." *Id.* With these caveats, Pugh's report calculated the current value of Wilmington Trust's overfunding commitment at $51.7 million for the 2005 to 2012 period.

46

Under the scheduling order, Plaintiffs had to file their Rule 26 rebuttal expert reports by August 10, 2012; both parties had to file their supplemental expert reports by August 21, 2012; and expert discovery closed on October 23, 2012. Pursuant to that order, Wilmington Trust submitted the expert report of Kevin Stephens, CPA, on July 16, 2012, more than a month before the deadline for submission of supplemental reports and three months before the close of expert discovery. Stephens's report challenged several of Pugh's assumptions regarding future interest rates and argued that Pugh's report did not provide a valid damages calculation. Plaintiffs did not file a rebuttal to Stephens's report or a supplemental report prepared by Pugh.

On September 20, 2012, Wilmington Trust deposed Pugh solely based on his June 6, 2012, report—the only report by Pugh that Plaintiffs disclosed. During his deposition, Pugh explained the present value and current value of underfunding calculations in his report as follows:

> What I presented [in my report] is *a model for which accomplishes a present and future value calculation of whatever variables go in.* Those variables would be a combination of many things, not just the premium payments of $5.5 million but other things that I just didn't have readily available to factor into this report. *So I wasn't asked to consider all factors and calculate a net result.*

Pls.' Resp. Opp. to Mot. *In Lim.* of Defendants Wilmington Trust Company and Wilmington Brokerage Services Company To Exclude the Expert Ops. of All Pls.' Proffered Experts, *Bresler v. Wilmington Trust Co.*, No. 8:09-cv-02957, Doc. No. 520-1, at 31 (D. Md. Dec. 3, 2013) (the "Motion *In Limine* Opposition") (emphasis added).

On October 29, 2013, more than a year after expert discovery had closed and two months before trial, Plaintiffs stated in their proposed pre-trial order that they would be seeking damages based on the difference, with and without overfunding, in the "net in trust"—the difference between (1) the death benefit and investment account at the time of Fleur's expected death and (2) the amount due to Wilmington Trust on the loans. Plaintiffs stated that they would rely on Pugh for an opinion as to this difference. A few days later, Plaintiffs disclosed a trial exhibit, PX-174, which was an Excel spreadsheet prepared by Pugh in which Pugh calculated his estimate of the alleged net-in-trust shortfall. In particular, the exhibit estimated an $11.2 million net-in-trust shortfall for the 2005 to 2013 period and an $8.7 million net-in-trust shortfall for the 2014 to 2019 period.

Wilmington Trust moved *in limine* to exclude PX-174 and to bar Pugh from testifying as to net-in-trust damages. Wilmington Trust argued that the proposed testimony and exhibit did not comply with Federal Rule of Civil Procedure 26 because it was outside the scope of Pugh's expert report. In particular, Wilmington Trust asserted that Pugh's report calculated only the "valuation of the purported underfunding"—not the net-in-trust shortfall—and that the report's calculation did not incorporate—indeed, expressly declined to provide opinions as to the value of—several variables and factors necessary to estimate the net-in-trust shortfall. These variables included: "'various costs and expenses related to the insurance policies'; 'the payments made to the insurance carriers'; 'the commissions paid by the insurance carriers'; and, 'the effect of underfunding on the cash values or the cash surrender values of the policies.'" Mem. Supp. of *Daubert* Mot. Of Defs. Wilmington Trust Co. & Wilmington Brokerage

48

Services Co. To Exclude the Expert Opinions of All of Pls.' Proffered Expert Witnesses, *Bresler v. Wilmington Trust Co.*, No. 8:09-cv-02957, Doc. No. 501-1, at 12 (D. Md. Nov. 1, 2013) (the "Motion *In Limine* Memorandum") (quoting Pugh Report at 4). Wilmington Trust further argued that the net-in-trust exhibit and testimony regarding net-in-trust damages was inadmissible because Plaintiffs could not meet their burden to show that their noncompliance with Rule 26 was "substantially justified or harmless" under the five factors set forth in *Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003).

In their memorandum in opposition to Wilmington Trust's motion to exclude, Plaintiffs maintained that Pugh's report provided the "formula" Pugh used to estimate net-in-trust damages, and that PX-174 simply would allow "the jury[] to 'populate' or plug in the correct variables as of the trial to apply the formula and reach the correct value." Motion *In Limine* Opposition, at 21. Plaintiffs further asserted that two of the variables Pugh relied on in PX-174 to calculate net-in-trust damages, LIBOR rates and annual cost-of-insurance figures, were discussed during Pugh's deposition and introduced in Stephens's report, respectively, and therefore that "Wilmington [Trust]'s assertion of 'surprise' is not supported by the discovery in this case." *Id.* at 29–31. Plaintiffs also stated that Wilmington Trust could "satisfy none of the five factors enunciated in [*Southern States*]," but, with the exception of the "surprise" factor, Plaintiffs did not specifically address any of those five factors. *Id.* at 31.

At oral argument on the motion, Wilmington Trust said it was prejudiced by Plaintiffs' failure to provide Pugh's net-in-trust damages calculation and exhibit PX-174

49

because Wilmington Trust never had a chance to depose Pugh regarding his opinion as to net-in-trust damages—and the variables and formulas underlying that opinion—or to submit a rebuttal expert report challenging Pugh's net-in-trust damages estimate. In response, Plaintiffs again told the district court that Pugh's disclosed report had provided the formula to calculate net-in-trust damages, and that exhibit PX-174 simply "plugged in" new numbers to that formula. *See, e.g.*, J.A. 1390–91 ("[W]hat [Wilmington Trust] got in the report was the formula. . . . All this chart does is plug the new numbers or the old numbers into the formulas that he gave his opinion on. That's all it does."). Plaintiffs said that they could not have provided Pugh's net-in-trust analysis earlier because they did not have access to key figures necessary to make those calculations, including cost-of-insurance information.

The district court orally denied Wilmington Trust's request to exclude PX-174 and limit Pugh's testimony to the opinions expressed in his report. The district court did not find that Pugh's proposed net-in-trust testimony violated Rule 26. On the contrary, the district said it "d[id]n't know that the rule about providing expert testimony says that every exhibit that he's going to use when he gives his testimony has to be provided at or about the time that he gives his report." J.A. 1393. The district court likewise did not expressly hold that any failure of Plaintiffs to comply with Rule 26 was substantially justified or harmless. Rather, the court noted that he would have allowed Wilmington Trust to depose Pugh if Wilmington Trust had so requested and that Wilmington Trust would have a chance "chop th[e] exhibit apart" on cross-examination, including by

50

establishing that the exhibit was not based on the opinions provided in the report. J.A. 1393–94.

The parties tried the case before a jury. Notwithstanding Wilmington Trust's renewal of its motion to exclude, Pugh testified as to his opinion regarding Plaintiffs' net-in-trust damages. Pugh's opinion changed several times during the course of his direct testimony and cross-examination. Pugh first estimated an $11.2 million net-in-trust shortfall for the 2005 to 2013 period and a $6 million net-in-trust shortfall for the 2014 to 2019 period (assuming Wilmington Trust immediately began overfunding), approximately $2.7 million less than the estimate included in the exhibit when it was first disclosed. During cross-examination, Pugh conceded several errors and offered to revise his estimates "on the fly." J.A. 2049. At that point, the district court cut off Pugh's testimony, stating:

> This case is in rather hopeless confusion right now with this witness. And what I'm going to let him do, we can pass him now and pick up another witness and let's see what he can calculate. . . . [F]rankly, it's just not clear where he is. He's sort of stammering on what to do with these new numbers. I think he may not be able to come up with any number at all. . . . From my standpoint, I can't follow this now.

J.A. 2049–50. Five days later, Plaintiffs called Pugh back to the stand and introduced a new exhibit, PX-174B, in which Pugh offered revised estimates of net-in-trust damages. Notwithstanding that he added data from 2004, Pugh revised his estimate for the pre-2013 period downward to approximately $10.7 million as a result of errors in his original estimate identified on cross-examination. Pugh revised upward his estimate for the 2014 through 2019 period to approximately $7.1 million (assuming Wilmington Trust

51

immediately began overfunding). Plaintiffs did not provide Wilmington Trust with the data and formulas Pugh used to generate PX-174B.

The jury returned a verdict in favor of Plaintiffs, awarding more than $23 million in damages. The jury drew its damages award—and the calculation of the net-in-trust shortfall, in particular—directly from Pugh's estimates in PX-174B.

Wilmington Trust filed a Rule 50 motion to set aside the verdict on numerous grounds, including Plaintiffs' failure to comply with Rule 26. In their memorandum in opposition, Plaintiffs *again* asserted that they had fully complied with Rule 26. And Plaintiffs *again* maintained that Pugh's June 6, 2012, report "provided formulas for his calculations, and sample calculations" and that Pugh's calculations in the exhibits and in his testimony at trial "merely utilized the numbers provided by Stephens and [Wilmington Trust's] counsel *to execute the calculations he described in his report*." Mem. Law in Opp. to Mot. of Wilmington Trust Co. for Judgment as a Matter of Law, or Alternatively To Amend the Verdict, Set a New Trial and/or Require Remittitur, *Bresler v. Wilmington Trust Co.*, No. 8:09-cv-02957, Doc. No. 608-1, at 32–33 (D. Md. April 3, 2014) (emphasis added).

This appeal followed. In their brief to this Court, Plaintiffs *continued* to assert that they had complied with Rule 26. Appellee's Br. at 25 ("[Plaintiffs] properly disclosed Pugh's basic methods and approach in discovery and timely disclosed his damages calculations and detailed illustrative exhibits under applicable deadlines in this case."). In particular, Plaintiffs *again* maintained that Pugh's report complied with Rule 26 because it "showed his formulas and assumptions for calculating the past shortfall and

52

projecting the future shortfall." *Id.* at 27. Plaintiffs also *reasserted* that Pugh could not have provided his estimates earlier because Wilmington Trust had not made the necessary information available. *Id.* at 27–29. Plaintiffs further argued that the district court did not err in refusing to exclude Pugh's damages testimony because exclusion is mandatory "only 'if a party fails to provide information . . . as required by Rule 26(a) or (e).'" *Id.* at 29 (quoting Fed. R. Civ. P. 37(c)(1)) (alteration in original). According to Plaintiffs, PX-174 "fully complied with Rule 26(e)," which provides for admission of "supplemental" expert reports, "obviat[ing] any need even to consider sanctions, much less complete exclusion." *Id.*

When pressed during oral argument, however, Plaintiffs conceded that—contrary to their repeated representations to both the district court and this Court—Pugh's report did not provide a formula for calculating the alleged net-in-trust shortfall, and therefore that the "numbers" provided by Stephens and Wilmington Trust could not have been "plugged in" to any formula in Pugh's report to determine his estimate of net-in-trust damages.

## II.

Wilmington Trust argues that the district court improperly allowed Pugh to testify as to net-in-trust damages when (1) Plaintiffs did not provide Pugh's net-in-trust damages calculation in their Rule 26 disclosures, (2) Pugh's expert report did not address net-in-trust damages, let alone provide a formula for calculating net-in-trust damages, and (3) Plaintiffs submitted exhibit PX-174, which first provided information on Pugh's net-in-trust damages calculation, more than a year after expert discovery closed. I agree.

53

A.

As the majority opinion correctly states, we generally review for abuse of discretion a district court's decision regarding whether a party violated a discovery rule. *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396 (4th Cir. 2014). We also generally review for abuse of discretion a district court's decision regarding whether to impose sanctions for a discovery violation. *S. States*, 318 F.3d at 595. We subject a district court's discovery decisions to deferential review because the district court "has an intimate familiarity with the relevant proceedings," *Houston v. C.G. Sec. Servs., Inc.*, 820 F.3d 855, 858 (7th Cir. 2016), and, therefore, is in a "superior[] . . . position to supervise the litigants and assess their good faith," *Lolatchy v. Arthur Murray, Inc.*, 816 F.2d 951, 957 (4th Cir. 1987) (Wilkinson, J., dissenting) (internal quotation marks omitted).

But the rationale for such deferential review does not exist when a district court "suffer[s] under a misconception that prevented a genuine application of [its] discretion to all facets of th[e] case," particularly when that misconception is attributable to the conduct or representations of the party that benefitted from the district court's misinformed exercise of its discretion. *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 988 F.2d 61, 63 (8th Cir. 1993) (refusing to defer to factual findings of district court supporting denial of motion for preliminary injunction when party against whom injunction was sought "misrepresent[ed], willful[ly] or otherwise" key facts and thereby "prevented the court from fully and fairly deciding whether a preliminary injunction should be issued"); *Mangini v. United States*, 314 F.3d 1158, 1161 (9th Cir. 2003) (subjecting district court's denial of a disqualification motion to plenary—rather than

54

abuse-of-discretion—review because party opposing disqualification motion "fail[ed] to provide [district court] with all the facts[,] depriv[ing] him of the opportunity to exercise his informed discretion"). Put differently, when a party's misrepresentations deprive a district court of the opportunity to exercise its discretion in an informed manner, the justification for appellate deference to the district court's decision no longer exists.

Here, Plaintiffs repeatedly misled, intentionally or otherwise, the district court regarding information essential to its disposition of Wilmington Trust's motion to exclude Pugh's net-in-trust damages testimony. For example, Plaintiffs repeatedly told the district court that Pugh's report disclosed the "formulas" Pugh used to calculate his opinion as to net-in-trust damages—and to estimate the variables underlying that calculation—and that exhibit PX-174 simply "plugged" newly available data into those formulas. Yet when pressed at oral argument, Plaintiffs conceded—as the record demonstrates—that Pugh's report did not include the formulas for calculating net-in-trust damages and, therefore, that PX-174 did not simply involve "plugging in" newly available data to previously disclosed formulas.

Likewise, Plaintiffs repeatedly told the district court that Pugh could not have provided his estimates of net-in-trust damages before the close of expert discovery because the data necessary to make those calculations—including data necessary to calculate future interest and crediting rates, expenses, financing costs, and cost-of-insurance—was unavailable. But Pugh's net-in-trust damages opinion relied on actual expense figures and premium financing and cost-of-insurance assumptions included in Stephens's report, which Wilmington Trust timely filed well before the close of expert

55

discovery and before the scheduling deadline for rebuttal and supplemental expert reports, *i.e.*, more than a year before Plaintiffs disclosed Pugh's damages estimate. Likewise, PX-174 and Pugh's trial testimony involved interest rate projections using historical LIBOR rates and projections using historical crediting rates, which Pugh could have made at the time he submitted his initial report, but did not. And most glaringly, Plaintiffs maintained—both before the district court and this Court—that actual cost-of-insurance information from the three insurance carriers was not available to Plaintiffs, and therefore Pugh, before the close of expert discovery. Yet, again contrary to Plaintiffs' assertions, Appellee's Br. at 28–29, Wilmington Trust granted Plaintiffs access to cost-of-insurance information from all three carriers *years* before Pugh submitted his initial report, J.A. 3284, 3287, 3290 ("This authorization shall be in force and effective until *the later of* December 31, 2009 or notification by us." (emphasis added)).

By misrepresenting the formulas and opinions contained in Pugh's 2012 report and the timing of the availability of the data Pugh used to prepare his net-in-trust estimates, Plaintiffs deprived the district court of information necessary to determine whether Plaintiffs failed to comply with Rule 26 and the district court's expert discovery scheduling order. Likewise, these misrepresentations deprived the district court of information necessary to determine whether any noncompliance with either Rule 26 or the scheduling order was substantially justified or harmless—the standard for determining whether a court must exclude noncompliant expert testimony. Because Plaintiffs' misrepresentations deprived the district court of information necessary to exercise its informed discretion, we review de novo—rather than for abuse of

56

discretion—(1) whether Plaintiffs violated Rule 26 and (2) whether any such violation warranted exclusion of Pugh's testimony as to net-in-trust damages. *See Dakota Indus.*, 988 F.2d at 63; *Mangini*, 314 F.3d at 1161.

B.

Regarding whether Pugh's damages testimony violated Rule 26, Rule 26(a)(1)(A)(iii) requires that a party provide "a computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based." A plaintiff must disclose its damages calculation within 14 days after the parties' Rule 26(f) conference, "unless a different time is set by stipulation or court order." Fed. R. Civ. P. 26(a)(1)(C).

Rule 26(a)(2)(B) requires that expert witnesses provide a written report that "must contain," among other things: "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; [and] (iii) any exhibits that will be used to summarize or support them." And under Rule 26(e)(1)(A), "[a] party who has made a disclosure under Rule 26(a) . . . must supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."

"Rule 26 disclosures are often the centerpiece of discovery in litigation that uses expert witnesses." *Saudi v. Northrop Grumman Corp.*, 427 F.3d 271, 278 (4th Cir.

2005). "The purpose of Rule 26(a)(2) is to provide notice to opposing counsel—before the deposition—as to what the expert witness will testify." *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008). Likewise, the Rule "prevent[s] unfair surprise at trial and [] permit[s] the opposing party to prepare rebuttal reports, to depose the expert in advance of trial, and to prepare for depositions and cross-examination at trial." *Minebea Co. v. Papst*, 231 F.R.D. 3, 5–6 (D.D.C. 2005). "The Rule also prevents experts from 'lying in wait' to express new opinions at the last minute, thereby denying the opposing party the opportunity to depose the expert on the new information or closely examine the expert's new testimony." *Id.* at 6.

To that end, the Rule "mandates a complete and detailed report of the expert witness's opinions, conclusions, and the basis and reasons for them." *Ciomber*, 527 F.3d at 642. "Expert reports must not be sketchy, vague or preliminary in nature" and "must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions." *Salgado by Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 741 n.6 (7th Cir. 1998). "A party that fails to provide these disclosures unfairly inhibits its opponent's ability to properly prepare, unnecessarily prolongs litigation, and undermines the district court's management of the case." *Saudi*, 427 F.3d at 278.

The majority opinion correctly concludes that Plaintiffs violated Rule 26. *Ante* at 22. But in reaching this conclusion the majority opinion omits any discussion of the numerous ways in which Pugh's net-in-trust testimony violated that Rule. First, Pugh's report did not provide Wilmington Trust with "a complete statement of all opinions the witness will express," as Rule 26 requires. Fed. R. Civ. P. 26(a)(2)(B)(i). In particular,

58

Plaintiffs did not identify Pugh as a damages expert, nor did Pugh's report state that he would provide a damages opinion. Notably, Pugh's five-and-a-half page report did not include the term "net-in-trust," let alone provide—or even allude to—Pugh's opinion regarding an estimate of net-in-trust damages.

And the "present value" and "current valuation of underfunding" calculations in the report materially differ from the various amounts of net-in-trust damages Pugh testified to at trial ($51.7 million in report vs. $11.2 million at trial for January 2005 to January 2013 period and $33.5 million in report vs. $8.7 million at trial for January 2014 to January 2019 period), which is unsurprising given that each calculation measured *different things* (the value, as of trial, of Wilmington Trust's annual $5.5 million lending commitment vs. differences in net-in-trust value as a result of Wilmington Trust's failure to comply with the premium financing agreement). J.A. 704, 3080. As Pugh explained, the calculations in Pugh's report simply determined the aggregate value, as of 2013, of a stream of $5.5 million loans from 2005 to 2019. J.A. 745-46 (explaining that the calculations in his report involved "basically just taking money over time at a certain interest rate and calculating what it would be today"). These calculations did not factor in, among other things, the costs of obtaining the loans, the trust's obligation to repay the loans, and the returns the trust would, or would not, obtain through use of the loaned funds—all of which are essential to estimating damages in a breach-of-contract-to-lend case, like the instant case. *See* Restatement (First) of Contracts § 343 (1932) ("Damages for breach of a contract to lend money are measured by the cost of obtaining the use of money during the agreed period, less interest at the rate provided in the contract, plus

59

compensation for other unavoidable harm that the defendant had reason to foresee when the contract was made."). For this reason, the present value and current valuation of underfunding amounts were not estimates of damages at all, which is why Pugh's report did not characterize those amounts as damages estimates and why Plaintiffs did not designate Pugh as a damages expert.

Second, not only did Pugh's report fail to provide an opinion as to net-in-trust damages—or, for that matter, *any opinion* as to damages—it also did not discuss most of the "facts" and "data" Pugh ultimately relied on in rendering his opinion as to net-in-trust damages. Pugh's damages testimony—and the trial exhibit upon which that testimony relied—used figures and assumptions that were *never discussed* in his report, such as projections of "cost of insurance," "other expenses," "crediting rates," and "premium financing rates." J.A. 704, 3067–79. Pugh's report expressly did not address, much less provide estimates of, those variables. *Id.* Additionally, Pugh's report did not include the "formula" Pugh used to calculate net-in-trust damages, as Plaintiffs now concede. And even if Pugh's report had included his "formula" for calculating net-in-trust damages— which it did not—the report would not have complied with Rule 26 because it would not have provided an opinion as to net-in-trust damages, and the data Pugh "plugged in" to formula to reach that opinion. Indeed, Pugh's report is devoid of *any* discussion of "how" he would calculate net-in-trust damages and does not provide *any* of Pugh's "bas[e]s and reasons" for concluding that the facts, data, variables, and methods he ultimately used were appropriate for calculating such damages. In sum, Pugh's report was precisely the "sketchy, vague[, and] preliminary" report Rule 26 forbids. *Salgado*,

60

150 F.3d at 741 n.6; *see also R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010) (concluding expert report did not comply with Rule 26 due to "lack of reasoning" and only "cursory support" for conclusions).

Third, Plaintiffs did not submit PX-174—their only disclosure estimating net-in-trust damages—as required by Rule 26(a)(1)(A) until more than *two years* after the court's deadline for submission of Rule 26(a) disclosures. *See* Joint Mot. for Entry of Sched. Order, *Bresler v. Wilmington Trust Co.*, No. 8:09-cv-02957, Doc. No. 229, at 1 (D. Md. June 10, 2011) (stipulating July 14, 2011, deadline for submission of Rule 26(a) disclosures). And Plaintiffs *never* provided Wilmington Trust with the formulas and data or other "bases and reasons" underlying Pugh's analyses in PX-174B, notwithstanding that Rule 26(a)(2)(B) required that Plaintiffs provide such information.

Fourth, Plaintiffs did not disclose exhibit PX-174 or PX 174B with Pugh's report, contrary to Rule 26's requirement that a party submit all of an expert's trial exhibits *with* the expert's report. Fed. R. Civ. P. 26(a)(2)(B)(iii).

Fifth, contrary to Plaintiffs' contentions, PX-174 did not constitute a valid Rule 26(e) "supplement" to Pugh's report. Rule 26(e) requires supplementation in a "timely manner." As explained above, virtually all of the additional information Pugh used to calculate net-in-trust damages was available more than a year before Plaintiffs submitted PX-174—and before expert discovery closed. *See supra* Part II.A. Accordingly, Plaintiffs did not submit PX-174 in a timely manner. *See Salgado*, 150 F.3d at 743 ("Because discovery was closed in the case, the information contained in the supplemental report must have been available before the missed deadline."). Indeed,

61

Plaintiffs did not submit the exhibit within the deadline for supplemental reports established in the court's scheduling order.

More significantly, far from being a "supplement," PX-174 included opinions outside the scope of Pugh's original report, including Pugh's: (1) formulas for calculating net-in-trust damages and estimating the variables necessary to calculate those damages; (2) projections of "cost of insurance," "other expenses," "crediting rates," and "premium financing rates"; and (3) estimates of damages. But Rule 26(e) "permits supplemental reports *only* for the narrow purpose of correcting inaccuracies or adding information that was not available at the time of the initial report." *Minebea*, 231 F.R.D at 6 (emphasis added). Indeed, "[t]o construe [Rule 26(e)] supplementation to apply whenever a party wants to bolster or submit additional expert opinions would [wreak] havoc in docket control and amount to unlimited expert opinion preparation." *Campbell v. United States*, 470 F. App'x 153, 157 (4th Cir. 2012) (first alteration added). Accordingly, because PX-174 included numerous wholly new opinions outside the scope of Pugh's original report and relied on data and information that was available prior to the close of expert discovery, it did not constitute a valid supplement. *See Minebea*, 231 F.R.D at 6 (excluding "supplement" that was a "substantial 'refinement' of the original report, containing new or different material and providing additional information to support specific elements of [the proponent's] case"). Indeed, treating PX-174 as a supplement "would contradict the purpose of Rule 26(a)(2) and Rule 37(c)(1), which specifically prevent further disclosures of expert testimony as trial approaches." *Id.*

Even if the rendering of an entirely new opinion constituted a valid supplement—as Plaintiffs wrongly claim—PX-174 did not constitute an adequate Rule 26(a)(2)(B) disclosure for numerous additional reasons: it does not provide the "basis and reasons" for the opinions and methods Pugh used to calculate net-in-trust damages or the "how and why" of his calculations—such as why he adopted certain of Stephens's assumptions and why he used a particular method or formula for estimating other variables. *R.C. Olmstead*, 606 F.3d at 271. Wilmington Trust was forced to learn the answer to these questions during cross-examination at trial, precisely the outcome Rule 26 is designed to prevent. *See Saudi*, 427 F.3d at 278; *Minebea*, 231 F.R.D. at 5–6.

In sum, Plaintiffs violated Rule 26 in numerous ways with respect to Pugh's expert report and damages testimony.

## C.

Having concluded that Plaintiffs failed to comply with Rule 26, it is next necessary to determine whether that violation warranted exclusion of Pugh's testimony as to net-in-trust damages. Under Rule 37(c)(1), "[i]f a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." The advisory committee notes to Rule 37(c)(1) characterize exclusion as an "automatic sanction." To that end, if a party's failure to comply with Rule 26(a) or (e) is not substantially justified or harmless, Rule 37(c)(1) "requires exclusion." *Campbell*, 470 F. App'x at 156; *Salgado*, 150 F.3d at 742.

## 1.

The majority opinion concludes that the district court did not *abuse its discretion* in concluding that Plaintiffs' noncompliance with Rule 26 was substantially justified or harmless under the *Southern States* factors. *Ante* at 26. But, as explained above, Plaintiffs' repeated misrepresentations deprived the district court of the opportunity to exercise its discretion in an informed manner and, therefore, mandate de novo, rather than deferential, review. *See supra* Part II.A.

Plenary review of the district court's decision not to apply the "automatic sanction" of exclusion is doubly warranted because the record provides no indication that the district court actually exercised its discretion to find that Plaintiffs' failure to comply with Rule 26 was substantially justified or harmless, as Rule 37(c)(1) requires to avoid mandatory exclusion. It is axiomatic that "[d]eference to an exercise of discretion requires discretion actually to have been exercised." *Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1106 (9th Cir. 2003). To that end, "[i]f the record reveals that the trial judge has failed to exercise the 'sound discretion' entrusted to him, the reason for . . . deference by an appellate court disappears." *United States v. Sloan*, 36 F.3d 386, 394 (4th Cir. 1994) (quoting *Arizona v. Washington*, 434 U.S. 497, 510 n.28 (1978)) (alterations in original). Accordingly, when there is no evidence that a district court exercised its discretion, "a *de novo* standard of review applies." *Jebian*, 349 F.3d at 1106.

Here, the record provides no evidence that the district court concluded that Pugh's damages testimony violated Rule 26 and therefore was admissible *only* if the

64

noncompliance was substantially justified or harmless. On the contrary, in its only statement regarding whether Plaintiffs complied with Rule 26, the district court said it "d[idn]'t know that the rule about providing expert testimony says that every exhibit that he's going to use when he gives his testimony has to be provided at or about the time that he gives his report," J.A. 1393, indicating that the district court *incorrectly* concluded that Pugh's proposed damages testimony complied with Rule 26.[1] And the district court never stated that any violation of Rule 26 was substantially justified or harmless, let alone addressed whether the *Southern States* factors supported admission of Pugh's net-in-trust testimony.[2] Indeed, the district court's apparent conclusion that Plaintiffs did not violate

---

[1] Even if we reviewed the district court's admission of the testimony for abuse of discretion, this statement is, by definition, an abuse-of-discretion because it runs contrary to the plain language of Rule 26(a)(2)(B), which says that "any exhibits . . . must" be included with the report. *Hunter v. Earthgrains Co. Bakery*, 281 F.3d 144, 150 (4th Cir. 2002) ("Of course, an error of law by a district court is by definition an abuse of discretion.").

[2] The majority opinion correctly notes that a district court need not expressly reference the *Southern States* factors in order to constitute a valid exercise of discretion to conclude that a party's failure to comply with Rule 26(a) or (e) was substantially justified or harmless. *Ante* at 23 n.15 (citing *Wilkins*, 751 F.3d at 222). But the absence of discussion of the *Southern States* factors, coupled with a district court's failure to expressly find that a party did or did not comply with Rule 26(a) or (e), is relevant to determining whether the district court *actually exercised its discretion* to conclude that a party's failure to comply with Rule 26 was substantially justified or harmless. *Wilkins* is illustrative. There, the district court unambiguously held that an untimely and "preliminary" expert report failed to comply with Rule 26. 751 F.3d at 219–21. The district court further concluded that the failure to comply with Rule 26 was not "harmless." *Id.* at 222–23. Although the district court did not expressly reference the *Southern States* factors, this Court held that the district court did not reversibly err, in part because its analysis of whether the noncompliance was harmless "implicitly addressed some of the *Southern States* factors." *Id.* at 222. Unlike in *Wilkins*, the district court here never expressly concluded that Plaintiffs violated Rule 26.

65

Rule 26 rendered it unnecessary for the district court to consider substantial justification or harmlessness.

Because the district court (1) never concluded that Pugh's proposed damages testimony failed to comply with Rule 26, and therefore was subject to exclusion absent a finding that the noncompliance was substantially justified or harmless, and (2) never expressly addressed whether any noncompliance was substantially justified or harmless, there is no basis for this Court to conclude that the district actually exercised its discretion to find that Plaintiffs' noncompliance with Rule 26 was substantially justified or harmless. Accordingly, this Court must review de novo whether Plaintiffs' numerous violations of Rule 26 were substantially justified or harmless—the question to which I now turn. *See also Sanders v. Venture Stores, Inc.*, 56 F.3d 771, 773 (7th Cir. 1995) (applying de novo review to district court's denial of leave to amend complaint—a question typically reviewed for abuse of discretion—because "district court did not indicate that its denial of Plaintiffs' motion . . . resulted from an exercise of its discretion").[3]

---

[3] Even if abuse-of-discretion review was warranted, the district court's failure to exercise its discretion to determine whether Plaintiffs' noncompliance with Rule 26 was substantially justified or harmless amounts to an abuse of discretion. *James v. Jacobson*, 6 F.3d 233, 239 (4th Cir. 1993) ("Perhaps [the] most obvious manifestation [of an abuse of discretion] is in a failure . . . either express or implicit, actually to exercise discretion."); *Ray v. Robinson*, 640 F.2d 474, 478 (3d Cir. 1981) ("If a district court fails to exercise its discretion, that is itself an abuse of discretion.").

2.

Because Plaintiffs failed to comply with Rule 26, they bear the burden "to show that the failure to comply was either substantially justified or harmless." *Carr v. Deeds*, 453 F.3d 593, 602 (4th Cir. 2006), *abrogated on other grounds by Wilkins v. Gaddy*, 559 U.S. 34 (2010). We have identified five factors for courts to consider in determining whether a party's failure to make a disclosure required by Rule 26(a) or (e) was substantially justified or harmless: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *S. States*, 318 F.3d at 597.

As an initial matter, the majority opinion correctly recognizes that Plaintiffs have *never* offered *any* justification for their noncompliance with Rule 26. *Ante* at 26. Accordingly, Plaintiffs' failure to comply with Rule 26 was not substantially justified.

Regarding harmlessness, Plaintiffs do not argue on appeal that they met their burden to establish harmlessness under the *Southern States* factors. And other than their conclusory assertion that Wilmington Trust could "satisfy none of the five factors enunciated in [*Southern States*]," Motion *In Limine* Opposition, at 31—an argument that wrongly suggested that Wilmington Trust, rather than Plaintiffs, bore the burden to establish harmlessness—Plaintiffs did not argue harmlessness before the district court, instead electing to maintain that Pugh's damages testimony complied with Rule 26. This failure alone warranted exclusion of Pugh's damages testimony, which did violate Rule

67

26. *R.C. Olmstead*, 606 F.3d at 270 (concluding that expert report that did not comply with Rule 26(a) was properly excluded because proponent "did not argue harmlessness before the district court. Instead, [proponent] argued only that [the] expert report met the requirements of Rule 26(a)")

Nonetheless, the majority opinion concludes that the *Southern States* factors weighed in favor of admitting Pugh's damages testimony. I disagree.

Regarding the first factor—surprise—Plaintiffs first disclosed that Pugh would testify to net-in-trust damages *after* the deadlines for submitting expert reports and supplemental and rebuttal expert reports, *after* the close of discovery, and *after* the court had ruled on the parties' motions for summary judgment. Indeed, Plaintiffs did not disclose exhibit PX-174, which contained Pugh's *first* opinion as to net-in-trust damages, until *after* the deadline for filing pre-trial motions. This Court has found surprise in virtually identical circumstances. *Wilkins*, 751 F.3d at 223 ("The [expert] disclosure was made after the agreed-upon expert disclosure date, after discovery was closed, after Appellee filed a motion for summary judgment, and on the very date set by the court for the filing of motions to exclude experts. It is hard to accept that these events would not serve as a surprise to Appellee, or that Appellee could easily cure such a surprise.").

Additionally, during his deposition, Pugh explained (accurately) that the present value and current valuation of overfunding calculations in his report involved "basically just taking money over time at a certain interest rate and calculating what it would be today." J.A. 745–46. And Pugh further testified at his deposition that he "wasn't asked to consider all factors and calculate a net result." Motion *In Limine* Opposition, at 31.

Based on these representations, Wilmington Trust was—and should have been—surprised that Plaintiffs intended for Pugh to provide an opinion as to net-in-trust damages (or, for that matter, any other type of damages). *See S. States*, 318 F.3d at 598 (holding that opponent of evidence was "surprised" by expert opinion provided in untimely supplemental report because, prior to submission of supplemental report, expert had stated in his deposition that "he had completed his opinions"). That surprise was exacerbated by Pugh's use of numerous facts and figures to calculate his opinion as to net-in-trust damages that were never discussed in his report or his deposition.

The majority opinion nonetheless maintains that the surprise resulting from Plaintiffs' noncompliance with Rule 26 was "minimal" because Pugh's report made Wilmington Trust "aware . . . that damages related to the plaintiffs' anticipated net-in-trust was a central issue in the case." *Ante* at 23. But a party does not satisfy Rule 26 simply by making the opposing party "aware" of "a central issue in the case." Rather, Rule 26 requires that expert reports include "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the facts or data considered by the witness in forming them," Fed. R. Civ. P. 26(a)(2)(B)(i)–(ii), so as to "permit the opposing party to prepare rebuttal reports, to depose the expert in advance of trial, and to prepare for depositions and cross-examination at trial," *Minebea*, 231 F.R.D. at 5–6. Accordingly, even if Wilmington Trust was not surprised that Pugh would provide an opinion on net-in-trust damages—which is doubtful given that Pugh testified during his deposition that *he was not asked* to render an opinion as to net-in-trust damages and therefore did not provide one—Wilmington Trust still was—and should have been—

69

surprised as to the particular formulas, methods, facts, and data Pugh used to calculate net-in-trust damages, many of which Pugh did not explain until he took the stand at trial. Indeed, if the majority opinion is correct that a party cannot be surprised by an opponent's expert testimony so long as the testimony relates to a "central issue in the case," then, without subjecting the opposing party to "surprise," a plaintiff's expert medical report in a medical malpractice action could omit any discussion of the mechanism by which the malpractice harmed the plaintiff, or the plaintiff's expert damages report could omit any discussion of the methods and assumptions used to calculate damages. Rules 26 and 37 do not contemplate such results.

The majority opinion further maintains that any surprise was "minimal" because some of the "updates . . . reflected in exhibit PX174" to the calculations in Pugh's report were based on data included in Stephens's report. *Ante* at 23. But PX-174 did not "update" Pugh's report, it provided wholly new opinions as to net-in-trust damages and the formulas, methods, facts, and data necessary to estimate those damages. *See supra* Part II.B. And even if PX-174 did amount to an "update" of Pugh's report, Wilmington Trust still would have been surprised by Pugh's use of information in Stephens's report because Stephens's report was submitted *months before* the deadline for submitting supplemental and rebuttal expert reports, which Plaintiffs declined to submit. Because Plaintiffs elected not to timely supplement Pugh's report or rebut Stephens's report, Wilmington Trust reasonably would have expected that Plaintiffs did not intend for Pugh to use the information in Stephens's report to calculate net-in-trust damages, or for any other purpose.

70

Finally, the majority opinion states that the surprise was minimal because the "updates" in PX-174 resulted in "a *decrease* in the amount of damages calculated." *Ante* at 24. But the present value and current value of underfunding figures provided in Pugh's reports *were not estimates of damages*, net-in-trust or otherwise, and therefore Pugh's opinions of net-in-trust damages did not "decrease" a previously disclosed estimate of damages—they amounted to wholly new opinions. *See supra* Part II.B. Moreover, even if PX-174 had decreased a pre-existing estimate of damages, it still would have resulted in prejudicial surprise. Errors in Pugh's analysis that Wilmington Trust identified during cross-examination reduced Pugh's net-in-trust damages estimates. If Wilmington Trust had had an opportunity to depose Pugh on his ultimate net-in-trust damages opinion, submit a rebuttal report, and prepare testimony challenging that opinion, it may have been able to identify further problems with Pugh's analysis and therefore further reduce Wilmington Trust's liability. Indeed, under the majority's position, a party could insulate its expert damages analyses from exclusion simply by submitting a conclusory report with an inflated damages estimate and then providing a reduced estimate prior to trial. Such a result contradicts Rule 26's purpose of "prevent[ing] experts from 'lying in wait' to express new opinions at the last minute, thereby denying the opposing party the opportunity to depose the expert on the new information or closely examine the expert's new testimony." *Minebea*, 231 F.R.D. at 6.

The second factor—the ability to cure the surprise caused by the Rule 26 violation—also supports excluding Pugh's damages testimony. Plaintiffs did not disclose that Pugh would testify as to damages and provide exhibit PX-174 until nearly a year

71

*after* Wilmington Trust deposed Pugh and *after* the close of expert discovery. More specifically, Plaintiffs waited to disclose Pugh's damages testimony until only a few weeks before trial. "The purpose of Rule 26(a)(2) is to provide notice to opposing counsel—*before the deposition*—as to what the expert witness will testify," *Ciomber*, 527 F.3d at 642 (emphasis added); "*to prepare rebuttal reports*," *Minebea*, 231 F.R.D. at 5 (emphasis added); and "to allow an opponent to examine an expert opinion for flaws and *to develop counter-testimony through that party's own experts*," *S. States*, 318 F.3d at 598 (emphasis added). Plaintiffs' noncompliance with Rule 26 deprived Wilmington Trust of the opportunity to depose Pugh with the benefit of his net-in-trust damages opinion, prepare a rebuttal report responding to Pugh's opinion, and to develop counter-testimony.

The majority opinion nonetheless maintains that Wilmington Trust could have cured the surprise by deposing Pugh after Plaintiffs disclosed PX-174. But Rule 37(c)(1) provides for a single remedy: exclusion. Accordingly, Wilmington Trust cannot be held wanting for failing to pursue lesser relief, particularly since Plaintiffs' disclosure came only weeks before trial. *Cf. Campbell*, 470 F. App'x at 156 ("[T]he district court did not abuse its discretion in failing to consider less drastic sanctions than exclusion of Campbell's expert witness, as Rule 37(c) requires exclusion unless the party establishes substantial justification or harmlessness."). And even assuming Wilmington Trust could have deposed Pugh during that brief period, the purpose of Rule 26(a)(2) "would be completely undermined if parties were allowed to cure deficient reports with later deposition testimony." *Ciomber*, 527 F.3d at 642. PX-174 was not a valid Rule 26

expert disclosure because it did not provide the "basis and reasons" and the "how and why" of Pugh's net-in-trust damages opinions or the formulas, methods, facts, and data underlying that opinion. *See supra* Part II.B. Accordingly, deposition testimony could not have cured Plaintiffs' noncompliance. And regardless of whether Wilmington Trust could have deposed Pugh, Plaintiffs' late and insufficient disclosure precluded Wilmington Trust from preparing and filing a rebuttal report to Pugh's net-in-trust damages opinion. Indeed, when Wilmington Trust sought to introduce post-trial a declaration by Stephens rebutting Pugh's net-in-trust testimony, the district court struck the declaration as untimely. Accordingly, the surprise caused by Plaintiffs' noncompliance was not—and could not have been—cured.

Regarding the third factor—disruption—not only did Pugh's net-in-trust damages testimony have the potential to disrupt the trial, it *did* disrupt the trial. In particular, the district court had to adjourn Pugh's testimony so he could recalculate his estimates of net-in-trust damages after cross-examination revealed numerous errors in Pugh's original opinion. J.A. 2049–50 ("[F]rankly, it's just not clear where he is. He's sort of stammering on what to do with these new numbers. I think he may not be able to come up with any number at all. . . . From my standpoint, I can't follow this now."). In cutting off Pugh's testimony, the district court said Pugh's shifting testimony left the district court "confused and the jury [] triply confused about where [Pugh] is coming out." J.A. 2051. This disruption, delay, and confusion is precisely what the expert discovery rules are designed to prevent. *Saudi*, 427 F.3d at 278–79. Had Plaintiffs timely disclosed Pugh's net-in-trust damages opinion, and provided a fulsome report supporting that

73

opinion, then Wilmington Trust could have deposed Pugh with the benefit of his opinions and the data and analyses underlying those opinions. And Wilmington Trust could have prepared a rebuttal report explaining the errors in Pugh's opinion. Therefore, the parties would have aired the issues with Pugh's analyses before he took the stand, and the disruption, delay, and confusion at trial would not have occurred.

As the majority opinion correctly finds, the final factor relating to harmlessness—the importance of the evidence—also supported excluding Pugh's damages testimony. This Court has emphasized that "importan[ce] . . . . must be viewed from *the perspective of both parties*." *S. States*, 318 F.3d at 598 (emphasis added) (internal quotation marks omitted). To that end, the more "important" the evidence, the more important it is for the proponent to "disclose[ the evidence] in a timely manner" because it is more likely to prejudice the opposing party. *Id.* at 599 (internal quotation marks omitted). That is precisely the case here. Pugh's net-in-trust testimony was Plaintiffs' principal evidence of damages. By depriving Wilmington Trust of the opportunity to "prepare rebuttal reports, to depose the expert in advance of trial, and to prepare for depositions and cross-examination at trial," *Minebea*, 231 F.R.D. at 5–6, Plaintiffs deprived Wilmington Trust of the opportunity to rebut what the majority opinion concedes was "vital" evidence in the case, *see Ante* at 25-26.

In sum, even if Plaintiffs had argued that their noncompliance with Rule 26 was substantially justified or harmless, Plaintiffs could not have satisfied their burden under Rule 37(c)(1). On the contrary, all of the *Southern States* factors supported excluding Pugh's damages testimony.

## III.

"Compliance with the Federal Rules of Civil Procedure in all actions embraced within the scope thereof is required and is essential to the orderly administration of justice." *Smith v. United States*, 369 F.2d 49, 55 (8th Cir. 1966). Likewise, "[c]ounsel have a duty to be candid . . . and the trial court, bearing a heavy caseload, relies on counsel to meet that duty." *Diaz-Fonseca*, 451 F.3d at 37. Plaintiffs' inadequate expert disclosures and Pugh's net-in-trust damages testimony at trial ran roughshod over the requirements of Rule 26 and materially prejudiced Wilmington Trust's ability to refute Pugh's damages testimony. And Plaintiffs' repeated misrepresentations deprived the district court of the opportunity to exercise its discretion to determine in an informed manner whether to admit Pugh's damages testimony. Affirming the admission of Pugh's damages testimony only serves to reward Plaintiffs for disregarding the Rules and making misleading statements to the district court. Because I cannot join in sanctioning such conduct, I dissent as to the majority opinion's affirmance of the jury's damages award.

75